IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION.

NASHVILLE, . . . . . . . DECEMBER TERM, 1875.

STATE OF TENNESSEE AND SAMUEL WATSON, Trustee *v.*
PRESIDENT AND DIRECTORS OF BANK OF TENNESSEE,
and others.

1. CONSTITUTIONAL LAW. *Obligation of contract. When impaired.* When
the common school fund was made a part of the capital of the Bank
of Tennessee, it became assets of the bank to which creditors of the
bank had a right to look, and a trust fund applicable to the payment
of its debts. The act, therefore, of February 16th, 1866, appropriating
the assets of the bank as school fund impaired the obligation of the
contract between the bank and its creditors and was a nullity, as was
also the assignment made in pursuance of that act, so far as it gave
preference to the school fund.

2. SAME. *Same. Power of bank acting under ante-bellum charter not affected
by attempted disunion.* The acts by which it was attempted to dissolve
the relations of the State of Tennessee with the Federal union, had no
effect in changing the charter of the bank, but it had the same powers
after as before the acts to carry on a legitimate banking business,
The receiving of deposits was a part of such legitimate banking busi-
ness, and the claims of deposit creditors of this character are entitled
to payment out of the assets in the order indicated by law.

1—VOL. 5.

State, and Watson, Trustee *v.* Bank of Tennessee.

3. SAME. *Same. Same. Assets. Order of payment.* So likewise was the issuance of its notes in compliance with the terms of its charter a legitimate part of its banking business. Such notes are, therefore, entitled to a priority of payment out of the assets of the bank, whether issued before or after the 6th of May, 1861, the date at which the ordinance of secession was passed, and the provisions of the amended Constitution of 1865 and accordant State legislation repudiating the liability of the bank for deposits received and notes issued after that date, are held void as impairing the obligation of contracts.

4. BANK NOTES. *When bank compellable to receive them at face value for debts.* Where at the time notes of a bank are issued and put in circulation, the law is that such bank should take its own circulation in payment of debts due to the bank, such law is a part of the contract between the bank and the holders of the notes so issued. The law being such at the time, the notes of the bank issued after May 6, 1861, commonly known as the "new issue," were emitted, it is held that a debtor had the right to discharge his debt to the bank in such notes at their face value.

5. BANK ASSETS. *What not. Special deposit.* State bonds purchased by school land funds in pursuance of law, and deposited by the counties interested, with the Bank of Tennessee, if capable of identification, belong to such counties and are not assets of the bank—but as to so much of those funds as cannot be so traced into State bonds now held by the bank, the counties entitled to such funds are its creditors without priority over other depositors or general creditors.

---

### FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson county. W. S. FLEMING, Ch., sitting by interchange.

E. H. EAST, for Trustee.

JOHN TRIMBLE, for Bank of Tennessee.

HORACE H. HARRISON, for Commissioners of Common Schools.

JOHN FRIZZELL, for County School Fund.

JOHN REID,
W. H. HUMPHREYS,  } for Depositors.
NAT. BAXTER, Sr.,

State, and Watson, Trustee *v.* Bank of Tennessee.

W. F. COOPER,   }
J. B. HEISKELL, }  for the State.

R. McPHAIL SMITH, }
ED. BAXTER,       }  for holders of New Issue.

NICHOLSON, C. J., delivered the opinion of the court.

The original bill was filed by the State and Samuel Watson, trustee, against the President and Directors of the Bank of Tennessee; W. G. Brownlow, Governor; A. J. Fletcher, Secretary of State; S. W. Hatchett, Comptroller, and various individuals named as creditors, and praying that publication be made, according to law, for all other persons claiming now, or hereafter claiming, to be creditors of said bank, and who will not come in and be made defendants, and required to file his, her, or its claim, in full, giving its origin, and consideration, and when and how it arose, and when said parties became the owners thereof, and the creditors of said bank.

The prayer is, that "all proper and necessary accounts be taken of the trust funds or their proceeds, and between said bank and trustee, or between the School Fund and said bank, and between said bank and its creditors, and the amount of its indebtedness ascertained, and the amount of its assets ascertained, and, if necessary, a rate bill be declared, and said trust be closed up under the decrees and orders of the court," etc.

Mark R. Cockrill answered, claiming to be a creditor of the bank as a depositor. He then filed his cross-bill on behalf of himself and such other depos-

itors as might come in. He attacked the act of the Legislature of 1865–6, authorizing an assignment, giving preference to the School Fund over creditors, as well as the assignment made under the act.

This cross-bill was demurred to and the demurrer sustained and his bill dismissed. He has appealed.

B. R. McKennie and others, claiming to be depositors to the amount of $130,000, filed their answer and cross-bill. They pray for relief against the State, as to the $5,000,000 of war bonds, purchased by the bank; and also for the failure of the State to furnish capital to the bank to the amount of $5,000,000—alleging that the State only furnished $3,600,000, and is now liable to make up the deficiency in the capital. This bill also attacks the act of the Legislature authorizing an assignment by the bank, and the assignment as unconstitutional.

Demurrers were filed by the defendants, insisting on the validity of the act and of the assignment, and that complainants in the cross-bill have no right to make the State a defendant for the purposes stated in the bill.

The demurrers were overruled, and the State and Watson appealed; but the appeal was afterwards set aside, and, then, the State by her counsel dismissed the original bill as to the State, which was allowed by the Chancellor. From this decree dismissing the original bill as to the State, the complainants in the cross-bill appealed. Watson, trustee, also appealed from the decree overruling his demurrer to the cross-bill.

Atchison & Duncan filed their answer to the ori-

ginal bill, claiming to be holders of the notes of the bank, known as "new issue," to a large amount, insisting upon the legality of their issuance, and attacking the act of the Legislature and the assignment, giving preference to the School Fund, and the provision excluding the "new issue," as null and void. This answer is filed for Atchison & Duncan and such other note-holders as may come in—but none have come in, as far as the record here shows. They do not file their answer as a cross-bill, and ask no relief against the State. They insist upon the validity of the new issue held by them, and claim for it priority in distributing the assets of the bank.

On the hearing of the cause upon the answer of Atchison & Duncan, the Chancellor held that the notes held by them were valid claims against the bank, and as such entitled to priority of payment out of the assets of the bank, and valid as perquisites of debts to the bank. From this decree Watson, the trustee, and the bank appealed.

By an agreement of record below, John Hall, as trustee of Marion county, became a party by petition, claiming that the proceeds of certain school lands in Marion county, deposited in the Bank of Tennessee, were preferred trust funds, entitled to priority of satisfaction. No action seems to have been taken below on this branch of the case.

It thus appears that the original bill has never been brought to a hearing in the court below, and that the proceedings on the cross-bills of Cockrill and of McKennie & Co., and on the answer of Atchison

& Duncan have only been preparatory to a final hearing on the original bill.

In considering the case in this court, we have confined ourselves to the questions properly presented by the record, and therefore have passed over several questions which were discussed in the arguments of counsel.

The question, whether the State had become a party by joining in the original bill, so that relief could be legitimately sought against her for matters not embraced in but entirely outside of the original bill, was raised by the demurrer to the cross-bill of B. R. McKennie and others. The court hold unanimously that the demurrer was erroneously overruled, and that the same ought to have been sustained. We hold also that the Chancellor committed no error in allowing the counsel for the State to dismiss the original bill, so far as the State was a party complainant. It follows that as the State is not a party to the suit, no question is presented in the case, involving the liability of the State, either to make good the original amount of $5,000,000, on which it was proposed that the bank should operate as capital; or, to make good the Common School Fund used as capital of the bank; or, to make good the $5,000,000 of war bonds, bought and held by the bank: or, to make good the school land funds deposited in the bank by Marion and other counties; or, to redeem the "new issue" of the bank by receiving the same in payment of taxes. Nor have we considered the question whether the State is entitled to be subrogated, in the distribution of the assets of the bank, to the extent of the old issue taken in and can-

celled for taxes. None of these questions were legitimately before us, for the reason that the State is not a party to the suit and cannot be so made without her express consent.

We may also remark, that we have not considered the question of the statute of limitations as applicable to the "new issue"—that question not arising in regard to the "new issue" notes held by Atchison & Duncan, and these being all, except those tendered in payment by R. H. Jamison, that are involved in the case as presented by the record.

The court agree in holding the following propositions:

1. When the Common School Fund was placed in the bank to constitute part of its capital, it became assets of the bank, to which the creditors of the bank had a right to look, and that these constituted a trust fund applicable to the payment of the debts of the bank. The act of the Legislature of 1866, which appropriated the assets of the bank as school fund, impaired the obligation of the contract between the bank and its creditors, and was therefore null and void— as was also the assignment made in pursuance of that act, so far as it gave preference to the school fund. It follows that the demurrer to Cockrill's cross-bill by the bank and the trustee Watson, etc., was erroneously sustained, and that the demurrer of the bank and of the trustee, etc., to the cross-bill of B. R. McKennie & Co. was properly overruled.

2. Upon the statements in the answer of Cockrill and of B. R. McKennie & Co., and in their cross-bills

as to the character of their claims as depositors, we hold that they are valid creditors of the bank. But if there is any illegality in their claims, it will devolve upon the bank or trustee by answer and proof to show such illegality or invalidity.

3. We hold that the acts by which it was attempted to declare the State independent, and to dissolve her connection with the Union, had no effect in changing the charter of the bank, but that it had the same powers after as before these acts, to carry on a legitimate banking business—and that the receiving of deposits was such legitimate banking business.

4. We hold that Marion and such other counties as deposited school land funds in the bank, are entitled to claim and receive from the bank such state bonds as can be identified, as bonds bought with such school land funds in pursuance of law; but as to so much of those funds as cannot be so traced into state bonds now held by the bank, the counties entitled to such funds are creditors of the bank, having no priority over other depositors or general creditors.

5. We agree in holding that the notes of the bank, issued since May, 1861, held by Atchison & Duncan and set out in their answer, are legal and subsisting debts of the bank, entitled to payment at their face value, and having the same priority of payment out of the assets of the bank, as the notes issued before the 6th of May, 1861. But we do not agree entirely in the course of reasoning by which we come to our conclusion. Three of the Judges have prepared and will file written opinions on this branch of the case—

the other two Judges concur in the conclusion, but do not concur with all the reasoning of either of the three written opinions.

6. A majority of the court hold that in the case of the *Bank* v. *Jamison*, the Circuit Judge committed no error, in sustaining Jamison's right to pay his debt to the bank, in the new issue notes of the bank at their face value. The judgment in that case is therefore affirmed. This holding rests upon the doctrine that when the notes of the bank were issued and put in circulation, the law which makes them good in payment of debts to the bank was in force, and constituted part of the contract between the bank and all holders of the notes so issued and put in circulation by the bank. On this point Judge McFarland dissents.

It results that the cause will be remanded for further proceedings on the original bill in the court below, in accordance with the rulings of this court.

The costs of this court will be paid by the trustee, out of the assets of the bank.

On the 16th of February, 1866, the Legislature passed an act to wind up and settle the business of the Bank of Tennessee, and for that purpose, directed that the President and Directors, without delay, and at as early a day as possible, cause an assignment and deeds of trust of all the assets of said bank and branches, and property of all kinds, real, personal and mixed, including the funds above describ d ($618,250), (meaning thereby the coin of said bank invested in seven-thirty U. S. bonds), and all interest accrued or ac-

cruing, to be made and executed in the name and on behalf of the Bank of Tennessee, and under its seal, for the uses, and in trust as follows: First, "to secure the full sum of $1,500,000, the amount of the Common School Fund deposited in the Bank of Tennessee, by act of the Legislature, which shall be a preferred claim, with interest accrued and accruing on said sums, since the 6th of May, 1861, which said sum of $618,250, U. S. seven-thirty bonds shall be retained and placed in the hands of the Treasurer of the State of Tennessee, as a part of said common school fund, originally deposited in the Bank of Tennessee;" and second, "the remainder of all assets, real, personal and mixed, shall be assigned for distribution *pro rata*, to make, hold, and secure, all remaining creditors, of all kinds, excluding all claims and demands of all kinds, after 6th of May, 1861, as absolutely null and void."

On the 4th of May, 1866, the President and Directors of the Bank, in pursuance of said act of the Legislature, executed a deed of assignment to Samuel Watson, trustee, of all the assets of the bank for the uses and trusts declared in said act of the Legislature.

On the 16th of May, 1866, the State of Tennessee and Samuel Watson, trustee, in obedience to the directions of said act of the Legislature, filed this bill against the President and Directors of the Bank of Tennessee, Wm. G. Brownlow, Governor, A. J. Fletcher, Secretary of State, S. W. Hatchett, Comptroller, and various individuals named as creditors, and praying that publication be made according to law, for all other persons claiming now, or hereafter claiming, to be creditors of

said bank, and who will not come in, and become parties complainants to this bill, be made defendants, and required to file his, her, or its claim, in fully giving its origin and consideration, and when and how it arose, and when said parties became the owners thereof, and the creditors of said bank. The provisions of the act of the Legislature of February 16th, 1866, and of the deed of assignment made in pursuance thereof, are set out in the bill, and on final hearing it prayed, that "all proper and necessary accounts be taken of the trust funds, or the proceeds, and between said bank and trustee, or between the school fund and said bank, and between said bank and its creditors, and the amount of its indebtedness ascertained, and the amount of its assets ascertained, and, if necessary, a rate bill be declared, and said trust be closed up under the decrees and orders of the court, according to the uses and trusts of said deed of assignment, and acts of the Legislature."

On the 31st of May, 1867, Mark R. Cockrill filed his answer, claiming to be a creditor of the bank to the amount of $15,654.41, as a general depositor, the deposits having been made subsequent to May 6th, 1861, and insisting on his right to a distributive share of the assets of the bank. And on the 24th of March, 1868, he filed his cross-bill, on behalf of himself and such others as might elect to come in as complainants. In this bill the act of the Legislature directing an assignment of the assets of the bank, giving preference to the school fund and excluding all claims bearing date subsequent to May 6th, 1861, as well as the as-

signment made in pursuance thereof, is assailed as unconstitutional and void.

Demurrers were filed to this cross-bill by the several defendants thereto, upon the ground that the Legislature had the constitutional right to pass the act of February 16th, 1866, and that the President and Directors of the bank had the right, under the law, to give the preference to the school fund and to exclude claims subsequent to May 6th, 1861, as provided in the deed of assignment.

On the 25th of June, 1869, the demurrers were sustained and the cross-bill of Cockrill dismissed. From this decree Cockrill appealed to this court.

On the 2nd of December, 1871, B. R. McKennie and others filed their answer and cross-bill, in the original suit, and on the 22nd of August, 1872, their amended answer and cross-bill. They claim to be depositors to the amount of $120,000, and to share in the assets of the bank, and if these are insufficient to satisfy their claims, they pray for relief against the State as to the bonds of the State, amounting to $5,000,000, transferred to the bank for money with which to procure military supplies in 1861, and also for the failure of the State to furnish capital to the bank to the amount of $5,000,000, as provided by the charter of the bank; charging that the State furnished only $3,-600,000, and that a large deficiency existed at the time they commenced making their deposits in 1859, and continued until the bank was put in liquidation in 1865. They pray that said $5,000,000 in bonds be declared valid assets of the bank—and if not, then that the

State be held to account to the bank, and to complainants in the cross-bill, for the sum of $3,280,000, which was paid over to the Governor and Financial Board, as the consideration for said bonds.    It is insisted in this cross-bill, that the section 2807 of the Code, authorizing suits to be brought against the State, is still in force, the act of 1865 repealing the same not having been constitutionally passed; and if this is not so, that as the State has come into court and made the creditors of the bank parties, they have a right to have the State's obligations ascertained and declared. They deny the right of the State to be subrogated to the rights of note-holders until it makes good the deficiencies, and pays up all its liabilities to the bank.

Demurrers were filed by the defendants to this cross-bill, which insisted upon the validity of the act of February 16th, 1866, directing an assignment of the assets of the bank and of the deed of assignment made in pursuance thereof; and also that the court has no jurisdiction to entertain a suit at the instance of complainants in the cross-bill against the State; and that the State having voluntarily joined in the original bill, merely for the purpose of having the assets of the bank administered, under the deed of trust to Watson, cannot be made a defendant to the answer filed as a cross-bill, and for any purpose outside of and beyond the scope and object of the original bill.

On the 22nd of November, 1872, the demurrers to the cross-bill and amended cross-bill of B. R. McKennie and others were overruled by the court and an appeal prayed and granted to the State and the trustee, Wat-

son. This prayer for appeal was subsequently, at the same term, withdrawn and suit set aside, and thereupon the State declined further to prosecute the original bill, and asked that the same, as to the State, be dismissed—which motion was sustained by the court and the original bill ordered to be dismissed as to the State, subject, however, to any right which may have heretofore been acquired by the complainants in the cross-bill, if any such exist.

From this decree dismissing the original bill as to the State, the complainants in the cross-bill appealed to this court, as did also the trustee from the decree overruling these demurrers.

On the 3rd of December, 1872, Atchison & Duncan filed their answer to the original bill, claiming to be the holders of a large amount of the bills or notes of the bank, issued after the 6th of May, 1861, known as the "new issue," and insisting that these bills or notes were legally issued and put in circulation, and that the bank is liable therefor. These defendants attack the act of February 16th, 1866, and the assignment made in pursuance thereof, as null and void, because of the preference given to the school fund, and because of the provision excluding the notes issued after May 6th, 1861, from payment. This answer was not filed as a cross-bill.

On the 31st of July, 1873, the cause was heard on the original bill and the answer of Atchison & Duncan and proof, when the Chancellor decreed that the notes or bills issued after the 6th of May, 1861, were valid and not affected by the amended Constitution of 1865,

or by the act of February 16th, 1866, the same being contracts that could not be impaired by constitutional amendments or legislative acts; and that the trustee, Watson, is bound to receive said notes or bills, in payment of debts due the bank.  And that Atchison & Duncan are entitled to the full face value of the notes or bills held by them, and to priority of satisfaction over the general creditors of the bank, and to share, *pro rata,* with all the bill-holders of the bank, whether old or new issue.  From this decree an appeal was taken to this court by Watson, trustee, and others.

In pursuance of an agreement entered of record in the court below and an order made in this court, John Hall, trustee of Marion county, filed his petition, claiming priority of satisfaction out of the assets of the bank, for the proceeds of certain school lands, placed in the bank under the act of 1844 of the Legislature. This claim rests upon the cession acts of North Carolina of 1789, and the act of Congress of 1843, authorizing the sale by the State of the school lands held in trust for the benefit of the children forever.

From the history of the legislation given from the record before us, it appears that the original bill of the State and Samuel Watson, trustee, against the Bank of Tennessee, has never been brought to a final hearing in the court below, but that the proceedings which have taken place on the cross-bills of Mark R. Cockrill and of B. R. McKennie and others, and on the answer of Atchison & Duncan and proof thereon, have all been preparatory to the final hearing.  These

proceedings resulted in decrees below, by which demurrers were sustained to Cockrill's cross-bill, and overruled to McKennie's cross-bill, and a decree in favor of Atchison & Duncan on their answer to the original bill—from all of which decrees appeals have been taken to this court.

The main question arising upon the demurrers to the cross-bills of Cockrill and McKennie, is, whether the act of February 16th, 1866, directing an assignment of the assets of the bank, giving preference to the school fund, and the assignment made in pursuance thereof, are valid and obligatory as against the depositors and other general creditors of the bank?

When the Bank of Tennessee was chartered, on the 19th of January, 1838, the State had the control of a Common School Fund, amounting to about $1,000,000. It was determined by the Legislature that this fund should constitute part of the capital of the bank. Hence by the 2nd section of the act incorporating the bank, it was provided "that the capital of said bank shall be five millions of dollars, to be raised and constituted as follows: The whole of the Common School Fund, whether the same is vested in stock in the present banks of the State, or in the hands of the Superintendent of Public Instruction, or in the hands of the County agents, or other persons, except so much as may have been vested in any works of internal improvements, as well as the proceeds of the Ocoee lands, shall constitute a part of the capital of the Bank of Tennessee." And by section 3, "that the money belonging to the Common School Fund, which now

State, and Watson, Trustee *v.* Bank of Tennessee.

may be in possession of the Superintendent of Public Instruction, or which may hereafter come into his possession, shall be handed over to the President and Directors of the Bank of Tennessee, as capital in said bank, and said President and Directors, or a majority of them, shall be authorized and required, for and in behalf of the State, and with a pledge of the public faith and credit, to issue to the Superintendent aforesaid, State stock or certificates of debt, for such sum or sums as may, from time to time, be paid over by said Superintendent to the said President and Directors."

The plain, unambiguous meaning of these provisions is, that the State assumed the power to vest the Common School Fund as capital in the bank, whereby the State became the debtor of the Superintendent of Public Instruction for the amount so vested, as evidenced by certificates of stock or indebtedness, issued to the Superintendent of Public Instruction by the President and Directors of the bank, for and in behalf of the State, and with a pledge of the faith and credit of the State, for the security of this indebtedness. The State thereby became the owner of stock in the bank to the amount of the Common School Fund, and consequently the debtor to that amount to the Common School Fund. This construction of the provisions referred to, is clearly recognized in section 8 of the charter, by which one hundred thousand dollars was annually set apart for common schools, out of the dividends of the bank, without regard to the actual dividends declared on the common school stock, or the actual amount of the capital of the bank—for the an-

nual payment of which sum the faith and credit of the State were pledged.

It is clear, therefore, that the Legislature intended to make and did make, the Common School Fund a part of the capital of the bank. But it is insisted that under the Constitution of 1834, the Legislature had no power to vest the Common School Fund as capital in the bank so as to divest it of its character as a trust fund.

It is declared in the Constitution of 1834, that the Common School Fund shall remain a perpetual fund, the principal of which shall never be diminished by legislative appropriation"—that "the interest of the school fund shall be inviolably appropriated to the support and encouragement of common schools"—and that "no law shall be made authorizing said fund, or any part thereof, to be diverted. to any other use than the support and encouragement of common schools." There is no ambiguity in this language of the Constitution. It dedicates the school fund as a perpetual fund, which is not to be diminished by legislative appropriations—but the interest thereof is to be inviolaby used for the support of common schools. It is a trust fund, to be controlled and managed by the Legislature, but so managed and controlled as to keep the principal undiminished, but at the same time to make interest for use in supporting and encouraging common schools.

This provision of the Constitution of 1834, was construed in the case of the *Governor* v. *McEwen.* It was held that previous to the Constitution of 1834,

the power of the Legislature over the school fund, was absolute and uncontrollable—and that under the provisions of that Constitution, the Legislature was pro-hibited from passing any law diverting either the prin-cipal or interest of the fund from the purpose for which it was designed—the support of common schools. It makes it the duty of the Legislature to do one thing, which it was not bound previously to do, viz: to appoint a Board of Commissioners for the State, to have a general superintendence of the fund. All other things are left as they were previously to the adoption of the Constitution, that is, subject to the control of the Legislature.

It follows, that under the Constitution of 1834, the Legislature not only had the power, but it was its duty in carrying out its trust, not only to guard the principal of the fund so as to avoid diminution, but so to invest it as to produce profits or interest for the support of common schools. It was clearly within the discretion of the Legislature to loan out the fund on sufficient security, to individuals or to the State, and when so loaned the trust would attach to the securities taken and would cease to attach to the fund loaned. The Legislature elected to vest the fund as capital in the Bank of Tennessee, for and in behalf of the State, and to give the faith and credit of the State as the security for the preservation of the fund and for an annual profit of $100,000 for distribution to common schools. Until the disasters growing out of the war came upon the bank, the fund was faith-fully preserved and the bank had promptly paid over

for common schools, $100,000 each year, for the period of over twenty years, making over two millions of dollars in actual profits. When the school fund went into the bank as capital it ceased to be trust funds for common schools, but became trust funds for the creditors of the bank.

It is laid down in Abbot's Digest of the Law of Corporations, 299, that "the capital stock of a company is a fund set apart by its charter for the payment of its debts, which amounts to a contract with those who shall become its creditors, that the fund shall not be withdrawn or appropriated to the use of the owner, or owners of the capital stock. On the dissolution of a corporation, its effects are a trust fund for the payment of its creditors, who may follow them into the hands of any one not a *bona fide* purchaser, without notice. A state law which deprives creditors of this right, and appropriates the property to other uses, impairs the obligation of their contracts, and is invalid. The fact that the State is the sole owner of the stock in a banking corporation, does not affect the rights of the creditors in this respect."

It follows, that so far as the act of February 16th, 1866, gives a preference to the school fund, and so far as the deed of assignment does the same thing, in the distribution of the assets of the bank, the same are invalid and void as to the creditors of the bank.

The next question is, whether the provisions of the act of February 16th, 1866, and of the deed of assignment, excluding depositors whose deposits were made

subsequent to the 6th of May, 1861, from any participation in the assets of the bank, are valid and obligatory?

In considering this question, we are to assume that the allegations in the cross-bills, that the deposits were made in the usual course of the business of the bank, are true, unless we can see, from all the facts and circumstances of which we can take judicial notice, that the deposits were illegally made.

It is manifest that the act of February 16, 1866, excluding from payment those deposits made after May 6, 1861, was void because it impaired the obligation of the contract between the depositors and the bank, unless that act was valid either by reason of the 5th and 6th sections of the Schedule to the amended Constitution of 1865, or by reason of the 4th section of the 14th amendment to the Constitution of the United States, or by reason of the power of the Convention of 1865 and the Legislature of 1866, representing the conquerors in the late civil war, to declare the claims of the depositors null and void.

By reference to sec. 5 of the Schedule alluded to, it is found that all laws, ordinances and resolutions, as well as all acts done in pursuance thereof, under the authority of the usurped State government, after the declared independence of the State of Tennessee, on or after the 6th of May, 1861, are unconstitutional, null and void from the beginning." And, by sec. 6 of the Schedule, "all laws, ordinances and resolutions of the usurped State government, passed on or after the 6th of May, 1861, providing for the issuance of State

bonds, also all notes of the Bank of Tennessee or any of its branches issued on or after May 6, 1861, and all debts contracted in the name of the State by said authority, are unconstitutional, null and void, and no Legislature shall hereafter have power to pass any act authorizing the payment of said bonds or debts, or providing for the redemption of said notes." And by the 4th section of the 14th amendment to the United States Constitution, "all debts, obligations and claims incurred in aid of insurrection and rebellion against the United States, shall be held illegal and void," and the United States and any state are forbid to assume or pay the same.

It is perfectly clear that none of the provisions of these sections of the Schedule of 1865, or of the 14th amendment to the Constitution of the United States, furnish any authority for the exclusion, by the act of February 16, 1866, of the claims of the depositors. The deposits were not made in pursuance of any law, ordinance or resolution of "the usurped state government," but in pursuance of the original charter of the bank passed in 1838. Nor are these deposits debts against the State, contracted in aid of insurrection and rebellion; but they are debts against the Bank of Tennessee, contracted, as alleged by the depositors, in the ordinary and legitimate business of the bank. If these allegations should be found upon answer and proof to be untrue, the claims would be rejected as illegal; but being taken as true, on the demurrer, they must be held to be legal claims against the bank, unless the Legislature of 1866, representing

the conquering government, had the power to declare these deposits null and void.

We have seen that the contracts between the depositors and the bank were not affected, or attempted to be affected, by the Schedule to the Constitution of 1865, or by the 14th amendment to the Constitution of the United States. Upon what principle could the Legislature of 1866 declare these contracts invalid? The people of Tennessee undertook to withdraw from the Federal Union and to connect themselves with the Confederate Union. This was accomplished, as far as it could be done, by the act of separation and the legislation of the 6th of May, 1861. The result was a resort to military force by the United States to enforce the laws and to restore the rightful authority of the Federal government in the territory of Tennessee. The people of Tennessee met force by force, and thus a civil war was inaugurated and prosecuted between the United States and Tennessee. The United States government did not wage a war of conquest, but a war to reinstate its authority in the State, denying the right of the State to separate from the Federal Union, and claiming all the time that the State was in the Union, and that her people, though in rebellion, were citizens of the United States. The restoration of the political relations between the government of the United States and that of the State of Tennessee was the sole object of the war on the part of the United States. It was not a war between two parties in Tennessee, each claiming to be the rightful government.

It follows, that when the United States triumphed and re-established their authority, they claimed and exercised the right of the conquering power in prescribing the terms on which the political relations should be restored, but not in interfering or claiming to interfere with the rights or contracts of the citizens not entered into in aid of the rebellion.

In the case of *White* v. *Hart*, 13 Wall., 647, the court says: "At no time were the rebellious states out of the pale of the Union. Their rights under the Constitution were suspended but not destroyed. Their constitutional obligations and duties were unaffected and remained the same. A citizen is still a citizen, though guilty of crime and visited with punishment. His political rights may be put in abeyance or forfeited."

Here it is expressly held that the constitutional obligations and duties of the State of Tennessee were unaffected by the fact that her people were in rebellion. She was prohibited by the Constitution from passing any law impairing the obligation of contracts. This prohibition was in as full force during the pendency of the rebellion and until the State was restored to the Union on the 24th of July, 1866, as before the rebellion commenced. This question was settled in the case of *White* v. *Hart*, already cited. In that case the State of Georgia, in order to be restored to her former political relations with the Federal government, amended her Constitution as required by Congress, and also providing that no court should give judgment or enforce any debt, the consideration

State, and Watson, Trustee, *v.* Bank of Tennessee.

of which was a slave.   In a suit by White on a note given for a slave in 1859, Hart sought to rely on this amendment to the Constitution of Georgia to avoid a judgment.   The Supreme Court of the United States say, "that the proviso which seeks to work this result is, so far as all pre-existing contracts are concerned, a nullity.   It is to them as ineffectual as if it had no existence."   This shows that although Georgia had not been restored to her relations with the Federal government under the reconstruction acts, yet the Constitution of the United States was in force and operated to prevent Georgia from passing a law impairing a contract between two citizens.

In the case before us, the Bank of Tennessee was as capable of contracting with depositors after the 6th of May, 1861, as before.   The attempt of the State to separate from the United States in no way affected the rights and powers of the bank under her charter. The bank occupied the relation of fiscal agent of the State before the attempted separation just as it did afterwards, and was as fully possessed of the rights and franchises conferred by the charter after as before the attempted separation.   The contract, therefore, between the bank and the depositors was as fully protected by the Constitution of the United States after the attempted separation as before.   It follows that the act of February 16, 1866, excluding the deposits made after May 6, 1861, from participation in the assets of the bank, is unconstitutional and void; and that the demurrer to the cross-bill of Cockrill was erroniously sustained; and that as to the cross-bill of

B. R. McKennie, so far as the questions already dis-
cussed are concerned, the demurrer was properly over-
ruled.

But B. R. McKennie and others, after answering
and insisting on their claims as creditors of the bank,
file their answer as a cross-bill, and pray for relief
against the State of Tennessee, on several distinct
grounds:—first, because the State failed to furnish the
means of making the capital of the bank $5,000,000,
as she was pledged to do; second, the State issued
her bonds for $4,000,000, and sold the same to the
bank, by which these bonds are now held as valid
assets, and which the State is liable to pay; and,
third, because the State, through her agents, received
from the bank over $3,000,000, in payment for the
bonds aforesaid, and appropriated the same to war pur-
poses, for which the State is liable, to the extent of
the deficiency in the assets of the bank thereby cre-
ated.     Whether the grave questions thus sought to be
raised are properly presented for our examination and
determination, depends upon a preliminary question
raised by the State by demurrer to the cross-bill of
B. R. McKennie and others.

In referring to the pleadings in the cause, we have
already stated that, although the original bill was filed
in the name of the State, as well as in the name of
Watson, trustee of the bank, yet that neither in the
allegations of the bill nor in its prayer was there
anything indicating that the State was seeking any re-
lief, or that she was for any purpose a necessary
party.

Notwithstanding this, we have seen that McKennie and others file their answer as a cross-bill, and they pray for distinct relief against the State for the alleged liabilities already specified, outside of the matters contained in the original bill.

The State demurred to the cross-bill, and, among other reasons, relies upon the fact that the allegations of the cross-bill seek to bring into contestation matters not involved in the original bill, and therefore not proper to be inquired into on a cross-bill.

If the Chancellor erred in overruling this demurrer, then the bill ought to have been dismissed as to the State; and, in that aspect of the case, the outside matters brought out in the cross-bill are not legitimately before us for consideration.

A cross-bill is brought by a defendant against a plaintiff or other parties in a former bill depending, touching the matter in question in that bill. It is treated as a mere auxiliary suit, or as a dependency upon the original suit, and can be sustained only on matter growing out of the original bill. 2 Danl. Ch. Pr., 1647; Milf. Eq. Pl., 80; Story Eq. Pl., secs. 339, 402.

It must be confined to the subject-matter of the original bill, and cannot introduce new and distinct matters not embraced in the original suit, and if it do so, no decree can be founded on those matters, for, as to such matters, it is an original bill, and they cannot be properly examined at the hearing of the first suit. 2 Danl. Ch. Pr., 1652.

In the original bill the trustee, for the purpose of

State, and Watson, Trustee, *v.* Bank of Tennessee.

winding up the bank and settling its affairs, made all the creditors of the bank parties, but the sole scope and object of the bill was confined to the closing out of the business and affairs of the bank. These defendants, claiming to be creditors, as depositors, seek to go beyond the purposes of the bill, and to obtain relief, not against the bank, but against the State, upon alleged liabilities of the State growing out of the losses of the bank assets. We are of opinion that these are distinct matters not embraced in the allegations or prayer of the original bill, and therefore not proper matters for a cross-bill. The demurrer was therefore erroneously overruled.

But it appears that after the refusal of the Chancellor to sustain the demurrer of the State, the counsel for the State then moved to dismiss the original bill so far as the State was a party, and upon this motion the State was allowed to dismiss, but with a reservation of any rights already acquired by the defendants.

We have seen that the defendants could acquire no rights by filing their cross-bill as to matters not embraced in or growing out of the original bill. It was error, therefore, for the Chancellor to refuse to permit an absolute dismissal of her suit by the State.

In this view of the case, we are bound to hold that the claims against the State sought to be enforced by the cross-bill of McKennie and others, are not properly before us for examination, and that the State is not now a party before the court.

Whether the State is subject to suit, as the law

now stands, is not a material question in this cause, but we may remark, that in the case of *Fry* v. *Britton*, 2 Heis., 609, this court held that the act of 1865, ch. 36, was a valid repeal of sec. 2807 of the Code, and we are not disposed to depart from that holding.

It is only necessary for us to say, as to the act of 1873, to which our attention has been called, that so far as that act directs the dismissal of suits pending at the time of its enactment, it can have no force, because it is judicial and not legislative in its character.

On the 26th of August, 1870, John Hall, as Trustee of Marion county, filed his petition in this cause, representing the fund derived from the school lands in Marion county, sold under the act of 1844, ch. 104, and paid over to the branch of the Bank of Tennessee at Athens, in pursuance of said act.

By the act of Congress, approved April 18, 1806, the United States conveyed to the State of Tennessee the lands within the present boundaries of the State lying east and north of the line known as the Congressional Reservation Line, subject, however, to all the "express conditions" found in the cession act of North Carolina of 1789, among which is the following:

"And the State of Tennessee shall, moreover, in issuing grants and perfecting titles, locate six hundred and forty acres to every six miles square in the territory hereby ceded, where existing claims will allow

the same, which shall be appropriated for the use of schools for the instruction of children forever."

This conveyance was "ratified, confirmed, and accepted" by the State of Tennessee by act of the General Assembly in 1806, ch. 10.

In pursuance of the trust so accepted by the State, surveyors were required to lay off school sections in each township, and by the act of 1817, ch. 125, grants were directed to be issued "by the State for the use of schools for the instruction of children."

The lands so laid off for the use of schools were rented out, and the proceeds used for school purposes, until 1844, when an act was passed by the Legislature providing, in pursuance of an act of Congress of 1843, for the sale of the school lands. By the third section of this act it was provided that upon the sale of the school lands the "notes, or obligations and money received by the Clerk of the Circuit Court, shall be delivered and paid over to the Bank of Tennessee, or any branch thereof nearest to the lands; and it shall be the duty of said bank or branch to collect said notes or obligations as they may become due and owing; and it shall be the further duty of said bank or branches to invest the principal so received or collected, in the bonds of this State, provided such bonds can be purchased at their nominal value or less. And provided, further, that said bank or branch shall be liable for the principal paid in, with six per cent. thereon, until the investments herein directed shall be made, and no longer," etc.

Petitioner states that the school lands in Marion

County were sold in pursuance of this act, and the money, notes, and obligations deposited in the branch bank at Athens, and he claims that the beneficiaries of this fund have a lien on the assetts of the bank prior to that of the other creditors, and prays that the same be declared accordingly.

It is true that the State held these school lands as trustee for the use and benefit of the children in their respective districts forever, and that by the Constitution of 1834 the Legislature was prohibited from diminishing the fund or devoting it to any other purpose. Down to the sale of the lands in 1844 nothing but the rents of the lands could be appropriated, the State having no power to sell them. But in 1843 Congress authorized the Legislature of Tennessee to sell the school lands, and "to invest the money arising from the sales thereof in some productive fund, the proceeds of which shall be forever applied, under the direction of said Legislature, to the use and support of schools within the several townships and districts for which they were originally reserved and set apart, and for no other use or purpose whatever." The lands were sold in strict conformity to this act of Congress, and the proceeds deposited in the bank for the purpose of investment in state bonds.

Upon these facts it is clear that the State was trustee for the beneficiaries of these lands, and was bound by the Constitution of 1834 to preserve the same undiminished by any legislative appropriation thereof. But by the act of Congress of 1843 specific directions were given to the Legislature to invest

the proceeds of the sales in "some productive fund."
This direction was strictly carred out by the Legis-
lature, when the proceeds were ordered, by the act
of 1844, to be deposited in the bank for investment
in state bonds.

· If the bank invested the funds in state bonds,
they would remain in the bank on special deposit,
and, as far as they can be identified, the beneficiaries
have a right to the benefit of them, and to this ex-
tent their claim is superior to that of all creditors of
the bank.    But if the bank failed to make the in-
vestment, or if made, and the bonds have been used
for other purposes, or cannot now be identified, in
either event there was a breach of the trust reposed
in the Legislature and in the bank, and the bank
becomes responsible for the amount so received on de-
posit, with interest.    But this claim, in that aspect
of the case, constitutes only an indebtedness to the
school districts as depositors, and is no lien superior
to that of other depositors.

Whether the State is liable by reason of the pledge
of her faith for the preservation of this portion of
the school fund, belonging to the school districts, to
make good any losses that may have been sustained
by the bank, cannot be inquired into in this case for
the reason already stated, that the State is not a party
to the suit.    Nor is this branch of the case before
us in a shape to authorize any further action on it.
The bank should have an opportunity to answer the
petition, and to make proper defense.    To this end
the petition will be remanded, that the claim may

State, and Watson, Trustee *v.* Bank of Tennessee.

be properly adjudicated on the hearing of the original
bill.

## NEW ISSUE.

Atchison and Duncan file their answer, claiming to
be the holders of a large amount of the notes of the
Bank of Tennessee, put in circulation after the 6th of
May, 1861, insisting that they are valid debts of the
bank, and entitled to *pro rata* satisfaction out of the
assetts of the bank with the notes issued prior to
May 6, 1861.

The validity of these notes is resisted on several
distinct grounds:

1. It is said that they were repudiated and de-
clared null and void by the Schedule to the Consti-
tution of 1865, and by the act of the Legislature of
February 16, 1866, and that the Convention and the
Legislature had the constitutional right to declare them,
null and void.

The first ground upon which this position is main-
tained, as stated by one of the counsel for the State,.
is as follows:

"We agree that the annulling of a valid contract
by a subsequent legislative act or constitutional amend-
ment would be void, because in conflict with that
provision. of the Constitution of the United States
which prohibits the impairing of the obligation of a
contract.  But that provision of the Constitution can
certainly have no application to contracts entered into
under a usurped government, by and between persons
in insurrection. and rebellion, and *a fortiori* to con-

3—VOL. 5.

tracts between the usurped and rebellious government itself, through its fiscal agent, and its rebel subjects. All such so-called contracts are at the mercy of the legitimate government, when restored. It is for the political department to say how they shall be treated by the government." And further, "By the rebellion, those who became parties to it, either voluntarily or through coercion of circumstances, are placed at once out of the pale of the law, and every thing they may do, either with their rebel government or between themselves, is tainted with ilegallity and void, if the legitimate government choose so to treat it through the action of its political department."

These positions rest upon the assumption that the late civil war, so far as the State of Tennessee was concerned, involved a contest between two contending forces, one representing the usurped or rebel government, and the other the legitimate or rightful government, and that the triumph of the Federal arms in that contest resulted in the conquest of the State by the rightful government; the consequence of which conquest was, that every thing done by those who became parties to the rebellion, either with their rebel government or between themselves, was tainted with illegality and void, if the legitimate government chose so to treat it through the action of its political department.

The other counsel for the State, upon a somewhat different process of reasoning, arrives at the same conclusion. He says that when two parties in a state submit the issues of political strife to the arbitrament

of arms, the result of that appeal must determine something. In the late contest, he says, "the result was that the then acting State Government was overthrown by revolution, and the new government established by arms and upheld by power. That revolutionary and successful government of 1865 then became the government of Tennessee, and that former government of 1861 perished. From the time the issue was tendered and accepted, the revolutionists of Tennessee, with aid from abroad, denied the right of the then government. On that issue they fought, and they succeeded in driving the government of 1861 from the State. As the successful revolutionists in the civil war, they have, by the universal law of nations and States, certain rights, one of which is to say what acts of the uprooted government are valid, and what void."

We do not understand the counsel in this statement of his position, to maintain expressly that the successful revolutionary government of 1865 had the right to declare contracts between citizens of the government of 1861 null and void, but the right to say what acts of the uprooted government are valid, and what void.

We deem it unnecessary to examine the question whether, upon the assumed state of facts, the positions of the counsel for the State are sustained by the authorities cited and relied on by them. We may remark, however, that we do not understand the language of Ch. J. Marshall, in the case of *Brown* v. *United States*, 8 Cr., 110, as justifying the conclusion

State, and Watson, Trustee *v.* Bank of Tennessee.

drawn from it by counsel. That language is, "Respecting the power of government (to confiscate enemy's property) no doubt is entertained. That war gives the full right to take persons and confiscate the property of the enemy wherever found, is conceded. The mitigation of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will." We do not think this language is susceptible of the interpretation, that after a rebellion by one or more states against the authority of the United States Government has been overcome, the political department of the successful government can declare null and void private contracts entered into between the citizens of the rebelling government, but having no connection with the rebellion. We think the correct rule, applicable to such cases, is laid down by Judge Catron in the case of the *United States* v. *Powers,* 11 How., 577, when he says, "By the laws of nations in all cases of conquest amongst civilized nations having established laws of property, the rule is that laws, usages, and municipal regulations in force at the time of the conquest, remain in force until changed by the new sovereign."

But in the case now before us, neither the Convention of 1865 nor the Legislature in 1866, in declaring the notes issued by the bank after May 6,

1861, invalid and void, undertook to annul or abrogate any law or usage, or municipal regulation of the rebel government; but they assumed to make void the contracts between the holders of the notes of the bank and the bank, because of their illegality. If these notes were put into circulation and received from the bank to aid in the insurrectionary movement, then they were void for illegality, at least in the hands of those who were not innocent holders; but whether so illegally put in circulation or not, is a judicial question, and not one for the Convention or the Legislature, unless the fact that the bank, besides being a trading corporation, was also, to a certain extent, the agent of the State in keeping and paying out its means justifies such a conclusion. As we have already stated, the bank occupied the same relation to the State after the 6th of May, 1861, as before, and no change in that relation was made by any act of the Legislature after that time. It received the revenues of the State on deposit and for safe keeping, and disbursed the same, on the checks of the Treasurer of the State, just as it received and paid out the deposits of individuals. It was independent in its operations of the State, except as those operations were controlled by the terms of its charter, or other laws of the State. It was not one of the fiscal agents of the State, as recognized by the Constitution. Its powers as a trading corporation were clearly defined, and among these was the power to issue its notes for circulation as money, upon the discount of notes or the purchase of bills. These were transactions be-

tween the bank and its customers, with which the State had nothing to do. They constituted private contracts, which were protected from infringement by the Constitution of the United States. The fact that the State was the owner of the capital stock, in no way affected these transactions as private contracts. They are to be governed by the same rules and laws as if they were contracts between natural persons.

But if it were admitted that the positions of the counsel for the State would be correct when applied to the assumed relation of the rebel government of 1861 and the legitimate government of 1865, yet they cannot control our decision, as we have a different view of the status of the State in the late civil conflict.

The Legislature of 1861 was the legitimate representative of the sovereignty of the State, so far as the law-making power was concerned. During the continuance of the war there was no other body which claimed to constitute the true legislative body. No issue between two such contending claimants was involved in the war. Those citizens who joined the Federal armies and fought against the army raised by the State, fought for no other object than that for which the Federal armies fought.

The Legislature of 1861 claimed the right to declare the independence of the State, and to separate from the Federal Union, provided the people of the State in their sovereign capacity should so determine. This right was asserted and ratified by the people, and it was so far successful that for a time all traces

of the authority of the United States Government were
obliterated. The Government of the United States
denied this right asserted by the State, maintaining
that the Constitution of the United States formed an
"indestructable union with indestructable states." The
issue thus joined was submitted to the arbitrament of
arms. The war was waged by the United States, not
for conquest, but to regain and restore its constitu-
tional authority in the State. To effect this armies
were raised and sent to meet and overcome the ar-
mies by which the constitutional authority of the United
States was expelled. It was maintained all the time
by the United States that the Constitution never ceased
to have force and vitality in the State; that its prac-
tical operation was only suspended by military force,
and that the State itself was all the time in the
Union, the legislative acts for her independence and
separation therefore being nullities.

In view of the positions maintained by the coun-
sel for the State, it is important that the issues in-
volved in the war, and the principles determined
thereby, should be clearly and distinctly ascertained.

1. The distinctive doctrine on which the United
States Government entered into the contest was, that
the Constitution created a government of individuals,
and not a confederacy of states. In this view the
Constitution created a national and not a federal
government. It was conceded that the government
of the nation and the government of the States are
each alike absolute and independent of each other in
their respective spheres of action; but it was main-

tained that the government of the nation is as much a part of the government of the people of each state, and as much entitled to their allegiance and obedience as their own local state governments, "the Constitution of the United States and the laws made in pursuance thereof" being, in all cases where they apply, the supreme law of the land. For all the purposes of the national government, it was maintained that the people of the United States are an integral, and not a composite mass, and their unity and identity, in this view of the subject, are not affected by their segregation by state lines for the purposes of state government and local administration.

Upon these doctrines the war was prosecuted by the United States, and by its result we are bound to accept them as the established principles of our government, so far as such questions can be settled in that mode, however much they may conflict with our individual convictions. From these principles the deduction is logical, that the rebellious states were at no time out of the pale of the Union; their rights under the Constitution were suspended, but not destroyed; their constitutional duties and obligations were unaffected, and remained the same. A citizen is still a citizen, though guilty of crime and visited with punishment. His political rights may be put in abeyance or forfeited. The result depends upon the rule, as defined in the law, of the sovereign against whom he has offended. *White* v. *Hart,* 13 Wall., 650.

From these premises it was determined, in the case cited, that a state, after her rebellion and before her

representation was restored, had no more power to pass a law impairing the obligation of contracts, or to do anything else prohibited to her by the Constitution of the United States, than she had before the rebellion began, or after her restoration to her normal position in the Union. The necessary sequence is, that during the existence of the rebellion private contracts in the rebel states, not affected by illegality, were protected against legislative infraction by the Constitution of the United States, and that upon the success of the national arms the national government, as the conquering party, claimed and exercised no other power than that of prescribing the terms on which the states should be restored to their former political rights, by representation in Congress. It follows, also, that the success of the national arms did not result in a conquest of the territory of the states in rebellion, and, therefore, that the principles of law applicable in such conquests have no proper application to the result of the late civil war; nor have those principles any application which govern as to the powers of the legal government in a state, after an unsuccessful attempt by a rival claimant to overthrow the legitimate government, as in the case of the Dorr rebellion. But the principles which govern upon the unsuccessful attempt by a portion of the states to assume and maintain their independence of the federal government, are necessarily deduced from the facts, that the states were never out of the Union, and that the Constitution of the United States never ceased to be in force in those states, and from the known par-

amount object, for the accomplishment of which the war was prosecuted by the United States, the restoration of the authority of the national government in the states, in which it was suspended by military force. It was no part of 'the object of the United States, in prosecuting the war, to interfere with the laws of the State, or with the private rights and contracts of her citizens, except where such laws were made to aid or promote the cause of the rebellion, or where such rights or contracts were affected by a like illegality. All such laws, rights and contracts not affected with the illegality referred to, were secure even against the consequences of war, for the reason that they were protected and preserved by the Constitution of the United States, which continued, in the midst of the war, to be operative for these purposes.

The triumph of the arms of the United States did not result in a conquest of the State of Tennessee, in the legal acceptation of that word, nor has the political department of the United States ever so regarded it. The Convention of 1865, and the Legislature of that year, came into existence as a consequence of the success of the United States armies, but neither they nor their constituents had achieved any conquest which secured to them the tremendous power of declaring such laws and such contracts void as they might choose to annul. The United States, the real conquering party, claimed no such power, nor, indeed, could such power have been claimed without ignoring the real object for which the war was waged, and without palpable violation of the United States Constitution.

These positions are sustained by the following authorities: 2 Black., 635; 4 Wall., 4; 2 Wall., 258; 3 Col., 554; 13 Wall., 647.

2. The resolution of Congress adopted on the 24th of July, 1866, whereby Tennessee was restored to representation in that body, refers to and recognizes the adoption of the Schedule to the Constitution of 1865, as follows: "Whereas, the people of said state did, on the 22d of January, 1865, by a large popular vote, adopt and ratify a constitution of government whereby slavery was abolished, and all ordinances and laws of secession, and debts contracted under the same, were declared void," &c. Upon no fair construction of this language, can it be understood to apply to any other than debts contracted under ordinances and laws of secession, but not to debts between individuals, contracted in their private transactions. After having accepted representation in Congress upon these terms, the State may be estopped from disputing their validity. But the terms refer alone to the restoration of the political relations between the United States and the State, and have no reference to contracts between individuals, which are protected from interference by the Constitution of the United States. *White* v. *Hart,.* 13 Wall., 647. As between the bank, therefore, and the noteholders, the resolution of Congress can have no application.

3. The same is true as to the language of the 14th amendment of the United States Constitution, which declares "neither the United States nor any state shall assume or pay any debt or obligation in-

State, and Watson, Trustee v. Bank of Tennessee.

curred in aid of insurrection or rebellion against the United States, * * but all such debts, obligations or claims shall be held illegal and void." This language, neither by its literal terms nor by fair implication, can be understood to apply to debts owing by the bank to its noteholders.

4. But the question still remains, whether, as a matter of fact, the notes of the bank put in circulation after the 6th of May, 1861, were so issued and put in circulation in aid of the rebellion, and for that reason illegal and void?

To determine this question, it becomes necessary to examine the proof as it appears in the record, in the shape of agreed facts and in depositions.

The proof in the cause shows that the officers of the bank were sympathisers in the rebellion, and cooperated freely and willingly with the Legislature and Governor of the State in carrying out the policy adopted by them in preparing for the conflict of arms which was then imminent between the United States forces and those of the State. To this end the bank officers voluntarily purchased the war bonds issued by the Governor under the authority of the Legislature, and placed the proceeds of those bonds to the credit of the military board, to be by that board checked out in defraying the expenses of raising and equipping troops and procuring supplies for the purpose of resisting the authority of the United States and sustaining the rebellion.

It further appears, that when the bank officers purchased the war bonds, they knew that in paying for

State, and Watson, Trustee *v.* Bank of Tennessee.

these bonds the means of the bank would be so far exhausted in meeting the drafts of the military board, that it would be necessary for the board of directors to make an additional issue of the circulation of the bank in order to meet the ordinary and legitimate business of the institution, as well as to meet the drafts of the military board.    It is thus apparent that the new issue in controversy originated in and was the known result of the action of the bank officers in purchasing the war bonds and applying the assets of the bank in paying for those bonds.

It also appears that the board of directors of the bank was legally elected, and fully authorized by the charter of the bank to increase the circulation by issuing new notes or bills, and that the amount of the new issue so made was not in excess of the amount authorized by the charter of the bank.    It is also shown that the new issue was in all respects similar to the old issue of the bank, and that when properly signed and ready for use, it was handed over to the teller of the bank to be paid out indiscriminately upon the checks of the creditors of the bank; and that, when so issued, it was put into circulation in the ordinary way by being paid out on checks of depositors, of parties having had notes and bills discounted, including to some extent the checks of the military board.

It is shown that the notes of the bank held by defendants Duncan and Atchison were bought in open market for from thirty to fifty cents in the dollar, without any knowledge or belief that they were issued.

State, and Watson, Trustee *v.* Bank of Tennessee.

in aid of the rebellion, but that they were bought after the assignment of the assets of the bank to complainant Watson as trustee.

Upon these facts the first question to be considered is, whether the act of issuing the notes in controversy for circulation was illegal? It may be true, as testified by Mr. Torbett, president of the bank, that he was opposed to negotiating for long time six per cent securities, and that he proposed negotiating for short time eight per cent securities, believing the bonds of the State to be undoubted security, and eight per cent fair remuneration to the bank; and that the board bought them, and paid for them, from time to time, in such funds as happened to be on hand, without regard to issues, there being at that time no distinction in the currency of the bank; and that the transactions with the State were in good faith, and believed to be for the best interest of the bank. Viewed from the standpoint occupied by Mr. Torbett, he may have overlooked the risk attending such transactions, but, misled by his strong sympathy with the cause of the rebellion, he no doubt honestly believed that it would prove successful, and consequently that the investment would prove remunerative. But it is manifest, from all the proof, that a leading consideration with the officers of the bank in making the investment, was to furnish to the Governor and the military board the means of making a successful resistance to the military forces of the United States. In this view, the issuance of the bonds by the State and their purchase by the bank were both illegal, as declared

by the 14th amendment to the Constitution of the United States.

The contract, as we infer from the testimony of Mr. Torbett, was, that the bank agreed to purchase the bonds and to pay for them, from time to time, as issued and transferred, with such funds as happened to be on hand, without regard to issues, there being at that time no distinction in the currency of the bank.

Under this contract the Governor executed and delivered to the board bonds to the amount of $4,300,000, of which $3,800,000 were passed to the bank, and the amount placed to the credit of the military board. The board seems to have disposed of $577,000 of the bonds, retaining $3,223,000. Up to and including the 31st of August, 1861, the military board had drawn out of the bank $4,195,540. The amount of new issue put out or issued up to August 31, 1861, was $329,160; so that $3,470,840 of the eight per cent war bonds must have been paid in the old issue of the bank, or other currency in circulation at the time. The amount of new issue put in circulation in 1861 seems to have been $1,469,299, thus showing that the amount of the new issue used in the ordinary business of the bank was $1,140,139. It is also shown, that the ordinary business of the bank during the year 1861, as indicated by its line of discounts, was slightly larger than for the year 1860.

It is apparent from these facts, that at the time of the contract for the purchase of the bonds by the bank, the ordinary and then issues of circulating notes

of the bank and its branches were insufficient to meet the usual banking business of the bank in 1861, and drafts or checks drawn upon the bank by the military board, and that the bank was compelled, in order to meet its regular business and the demands of the board, to resort to the issuance of the bank notes now in controversy, and that said notes, constituting the new issue, were all put in circulation after the 6th of May, 1861, and for the purposes of meeting its regular business and the drafts of the military board.

It does not appear, however, from the proof, that the ordinary issues of the bank, together with its other available means, were insufficient to meet the drafts of the military board, but that in fact the bank was able to have met these drafts without any additional issuance of new notes. We have seen that the bank received bonds to the amount of $4,300,000, and sold of these $1,077,000, leaving the amount of bonds retained by the bank $3,223,000. We have seen, also, that the amount of drafts of the military board paid by the bank amounted to $4,625,460. If we deduct the amount of bonds sold—$1,077,000—it leaves $3,-548,460 to be met by the ordinary issues of the bank and its other available assets. It appears that the bank had on hand of its ordinary or old issue $2,-887,367, and notes of other banks $2,045,000, making an amount equal to $4,933,267—leaving a balance of $1,384,807 over and above the amount necessary to meet the military board drafts.

In this connection, it is proper to refer to the tes-

State, and Watson, Trustee v. Bank of Tennessee.

timony as to the manner in which the new issue was made. S. Watson, the trustee, testifies that the issues made after May 6, 1861, were made, from time to time, by the mother bank and branches, were charged to the cash account when made, and consequently turned over to the cashier, to be paid out by him upon any checks that might be presented. The books of the bank show no difference in the issuance and paying out of notes prior and subsequent to May 6, 1861. They also show that the notes issued after May 6, 1861, were issued and paid out in the regular course of business, and that they were entered on the books as all former issues had been. And there is nothing in the account books or records of the bank showing that they were paid out in aid of the rebellion, or that they were not paid out like all other issues of the bank. Nor do the books furnish any evidence that the new issue notes were received by any person or persons with any knowledge that they were issued and paid out in aid of the rebellion. The trustee adds: "I have no reason to believe that any notes of the bank were issued in aid of the rebellion, unless it be the $177,000 issued after the bank was removed from Nashville. Of the issues subsequent to May 6, 1861, $1,093,560 were issued by the mother bank at Nashville, and $701,660 by the branches." It is agreed that all the drafts or checks of the military board were drawn on the mother bank, and none on the branches.

The president of the bank, G. C. Torbett, testified that the issues in question were made under the au-

State, and Watson, Trustee *v.* Bank of Tennessee.

thority of the board of directors, appointed in 1859, and confirmed by the Legislature in 1859–60, who organized in January, 1860, and whose term extended to January, 1862, and until their successors were qualified. The new issue notes were issued in the usual way, by receiving the signature of the president and cashier, then passed into the teller's cash, and was paid out promiscuously, as all other banking funds, as money, to all who had the right to check on the bank for money. The signing and issuance were done in strict conformity with the charter and laws, as the board understood them. He did not believe that the amount issued ever exceeded the amount authorized by the charter and capital of the bank. The entire amount of money issued while he was president of the bank was regularly registered for circulation by the supervisor of banks, and a record of the same kept. The issuance of the new notes was done in the usual way, having a strict regard to the charter, laws of the State, and the interest of the bank.

H. L. Claiborne, principal book-keeper in the bank, testified: He believes no notes were ever issued except in strict accordance with the charter. He has no evidence whatever that said notes were issued in aid of the rebellion. The evidence he has that they were paid out for the regular business of the bank and of the country was his position as book-keeper in charge of the general accounts of the bank. The notes were issued for circulation; they were paid out by the teller of the bank, whose duty it was; he knows of no instance of their being paid out against the usual

State, and Watson, Trustee, *v.* Bank of Tennessee.

habit, or the usual custom of the business of the bank.

From all this testimony we think the following propositions are established:

1. The new issue was made by a board of directors legally appointed and qualified in the usual way prescribed by the charter of the bank, and in pursuance of law.

2. When the bank officers contracted with the Governor of the State for the purchase of the war bonds, the old issue and other available assets of the bank on hand were sufficient to meet the indebtedness incurred by the purchase, without resorting to a new issue of notes for that purpose.

3. The necessity for the new issue of notes was produced by the appropriation of the available means of the bank in meeting the drafts and checks of the military board.

4. The new issue, when signed by the president and cashier of the bank, passed into the hands of the teller as money, to be paid out as other bankable funds, on checks upon the bank.

5. The new issue was made for the purpose of being used in the ordinary transactions of the bank, and with no special purpose of being paid out upon the checks of the military board.

6. The new issue passed into circulation, together with the old issue and other bankable funds, in payment of all indebtedness of the bank, including that to the military board.

7. There was nothing on the face of the new issue

which distinguished it from the old issue of the bank, and it passed into circulation and was transferred from hand to hand by delivery, as other money, being payable to bearer.

8. There is no proof tending to show that the present holders of the new issue, or those who received it directly from the bank, had any knowledge that it was issued for any illegal purpose; but as the present holders became such, since the ·adoption of the amendments to the Constitution, in 1865, and the act of Assembly, in 1866, repudiating these notes as illegal and invalid, they are affected with notice of these provisions of the Constitution and of the act of the Legislature.

From these several positions, which we regard as established by the record, it follows that the notes in controversy were issued by a board of directors legally appointed and qualified, for the legitimate purposes of the ordinary business of the bank; and, therefore, that the act of issuing the notes to be so used was legal and valid; unless their issuance was so connected with and dependent upon the illegal contract for the purchase of the war bonds and the payment therefor, as to constitute a part of that illegal contract. The officers of the bank agreed to buy the war bonds, from time to time, as they might be issued, and to pay for them out of the means of the bank. This was the entire contract. It had no reference to the future action of the bank in providing the means of carrying on its regular banking operations. All the bank undertook to do was to pay for the bonds as

State, and Watson, Trustee v. Bank of Tennessee.

they were issued and delivered. The bank was authorized by the Legislature to make the contract, and it was. made with the Governor of the State.

In his testimony Governor Harris says, that "every bond that was taken by the Bank of Tennessee was purchased voluntarily, and without either coercion or persuation on the part of himself or the military board, the officers of the bank having, from the beginning, expressed themselves as ready to co-operate with him in carrying out the measures necessary to the raising, equipment and maintenance of the army to the extent of their ability, and feeling perfectly satisfied, as he did, that they were in full sympathy with him with regard to those measures, he had no occasion to determine what he would have done if they had entertained different opinions, and had pursued a different course." He says "he adopted the officers of the bank as his chief advisers upon all financial questions, and was more influenced by their advice upon those questions than the advice of all other persons."

It thus appears that the officers of the bank co-operated voluntarily and fully with the Governor in making the contract authorized by the Legislature, and for the purpose of carrying out the rebellious policy adopted and prescribed by the legislative and executive departments of the State. That the contract so made, although thus sanctioned, was illegal, cannot now be a debateable question. Had the rebellion proved successful as a revolution, it might have been regarded as both legal and wise; but, in view of the result, we are bound to hold it both illegal and disastrous to the bank.

But its illegality can extend no further than the terms embraced in the contract. It was not illegal for want of power in the bank to make it, for the Legislature recognized its existence as a corporation capable of contracting, by conferring upon it the power to make the purchase of the bonds. Its illegality was because it was a contract made in aid of the rebellion against the United States Government. But the powers of the bank, as conferred by its · charter, were not affected by the illegal exercise of the special power conferred to purchase the war bonds. The power to issue notes for circulation within prescribed limits remained as complete after as before the purchase of the bonds. The bank officers brought themselves under no obligation, by their purchase of the bonds, to resort to the exercise of this power in supplying the deficiency in the circulation of the bank to meet its current business. They were willing to aid the rebellion by purchasing the bonds to the full extent of their ability, but they still had the right under their charter to provide a new issue of its notes to meet the demands of their banking business, and they agreed, very willingly as it has turned out, to exhaust all their present available means in war bonds, relying, as they had a right to do, upon the issuance of new bank notes to carry on their ordinary banking operations.

It is apparent that there was no necessary connection between the contract to buy the bonds and the issuance of the new notes. It was competent for the bank officers to decline to fill up the vacuum in their

State, and Watson, Trustee, v. Bank of Tennessee.

available means, and to proceed to winding up the affairs of the bank. They chose, however, to exercise their power to issue new notes for circulation, and to continue the ordinary banking business of discounting notes, and buying bills, and receiving deposits. These constituted the legitimate business of the bank, and ' to carry it on they had the right to make the new issue of the notes of the bank. The charter of the bank was the same under the State government after May 6, 1861, as before that time. Its powers and franchises were unchanged by the change in the government. It continued to be fiscal agent of the State Government to the same extent, and no more, that it had been under the former government, except that its charter was subject to the amendment or repeal of the Legislature. It was as separate from and independent of the control of the other departments of the government as any other incorporated institution.

It follows that the notes issued by the bank after May 6, 1861, for the legitimate purposes of banking, when put into circulation by the bank in its ordinary operations, took the character of money, and were in all respects subject to the laws which govern the circulation and transfer of bank bills, as distinguished from those that govern as to the circulation and transfer of promissory notes. They were not, properly speaking, evidences of debt or security for money, but were treated as money in the ordinary course and transaction of business by the general consent of the community. They were transferable by delivery, and

State, and Watson, Trustee, v. Bank of Tennessee.

were issued and put in circulation with the avowed intention that they should pass from hand to hand, and circulate as money. In this view, the liability of the bank to pay them remained, and was a continuing promise to pay, until actual refusal of payment, upon demand made. *Farmers' and Mechanics' Bank of Memphis* v. *White*, 2 Sneed, 482; Morse on Banks, 403.

It follows, also, that as the notes in question were legally issued, and were genuine bills of the bank, in the hands of innocent holders, the bank could not resist their payment, although put in circulation by the bank in payment of debts illegally contracted by the bank. In this respect the notes issued after May 6, 1861, stood on the same footing as those issued before that time, and as to the latter it has never been contended that the bank was not liable for their payment, although put in circulation in carrying out the illegal purchase of the war bonds.

From the nature of bank notes circulating as money, the promise of the bank being to *bearer*, each holder becomes himself a direct contractor with the bank, and every time a bank note is transferred from one holder to another, a new contract and a new cause of action is created. Morse on Banks, 403. It results, that in the hands of an innocent holder, the bank is responsible, although the first holder may have received it illegally from the bank.

The only facts relied on to show that the present holders of the new issue are not innocent holders, are, the admission that the notes were bought at a heavy

discount, after the assignment of the assets of the bank, and with a knowledge that they had been repudiated as illegal by the amendment to the Constitution of 1865, and the act of the Legislature. It is in proof that down to the time of their repudiation as aforesaid, the notes in question circulated, in all respects, at par with the old notes of the bank. It is clear that their depreciation was produced by the action of the Constitutional Convention and of the Legislature. But we have seen that this action was unauthorized, and had no legal effect. It is clear, therefore, that the knowledge on the part of the holders of the notes that they had been illegally repudiated could not amount to any notice that they were illegally issued. This illegal action of the Convention and the Legislature, being in violation of the Constitution of the United States, furnished no valid excuse to the bank for refusing to pay notes for which it had received full consideration. If the holders of the notes chose to purchase them, so depreciated, and to risk the liability of the bank for their payment, the fact that they were bought at a discount can furnish no ground of defence against their full payment. *Clark* v. *The State and Bank of Tennessee,* 7 Cold., 306.

It was provided by the act of 1859–60, carried into the Code, sec. 1829*b*, that billholders shall be entitled to preference over all other creditors of an insolvent bank. This act was in force when the bank put the notes in controversy in circulation. It became part of the contract between the bank and the holders of the notes. This principle was recognized

by the Supreme Court of the United States in the case
of *Furman* v. *Nichol*, 8 Wall., 61, and also in the
case of *Clark* v. *The State and Bank of Tennessee*, 7
Col., 306, in the latter of which cases the court said
that "the fact that a portion of the notes held by
complainants were purchased at a discount would not
lessen or affect their rights. The notes are negotia-
ble, and the purchaser takes, in regard to the right
of payment, all the rights and equities of the vendor."
No subsequent action of the bank or of the Legisla-
ture could affect the rights thus acquired. They are
rights which attached to the notes themselves, and
passed by transfer to each successive holder.

We know of no rule of law, or legitimate process
of reasoning, by which the illegality of the purchase
of the war bonds by the officers of the bank can be
made to descend, or be transmitted to subsequent trans-
actions of the bank, in all respects regular and legal.
If the subsequent transactions of the bank, based upon
the new issue, were illegal, then, upon the plainest
principles of law, the promissory notes and bills of
exchange discounted and bought with the illegal issue
were affected with illegality, and could not be collected
by the bank. But the bank has gone on to collect
these notes and bills, and no one has attempted to
rely upon such a defense. That the bank should dis-
count the notes and buy the bills of its customers in
their ordinary business transactions, pay for them in
its own new issue, claim to collect the notes and bills
so discounted and bought, and yet resist the payment
of their own notes, upon the allegation that she had

illegally issued and paid them out, would outrage every principle of law and justice.

It follows that as between the bank and Atchison & Duncan, the bank is responsible for the face amount of the notes of the bank issued after May 6, 1861,. and set out in their answer.

The record contains the answer of R. H. Jamison,. administrator, who filed the transcript of a case tried in the May Circuit Court, in which the Bank of Tennessee sued Isaac M. Jamison's administrator, R. H. Jamison, on a note of two hundred dollars, and to which the administrator put in a plea of tender of payment in the notes of the bank, issued after May 6, 1861. To this plea the bank replied that the notes so issued were illegal and void.

The case was submitted to a jury on the issue so made, when the Circuit Judge charged the jury that the rights of the bank and the holder of its bills were fixed at the time the bank issued and circulated the notes tendered, and that these rights could not be impaired by any subsequent action on the part of the state.

Under this charge the jury found the plea of tender for defendant, and the bank appealed to this court.

The question raised by the pleading and charge of the court is, whether the holder of the new issue of the bank had a right to pay off his debt to the bank in a like amount of the new issue? The notes in question were issued by the bank after the 6th of May, 1861, and before the 8th of June, 1865, when the Legislature passed an act empowering the several

, banks in the state to make assignments. At the time these notes were put in circulation the general banking law of the state was in operation. By the 27th section of that act, it was provided that " in case of the insolvency of any bank or banking association, the billholders thereof shall be entitled to preference in payment over all other creditors of such bank or association, and no transfer or assignment of any note, bill of exchange, or other evidence of debt by the bank, shall prevent the debtor from paying the same in the hands of the assignee, in the currency of such bank."

This act was incorporated into and became a part of every contract between the bank and its customers who received the notes of the bank for their promissory notes or bills of exchange. Every note so issued and put into circulation was impressed with the preference provided for by this law. This was a continuing contract, and passed to every new holder of the notes after they entered into circulation. In this respect the law became in effect a part of the charter of the bank, just as much so as that provision of the charter of the Bank of Tennessee which made its notes receivable for taxes. For this reason the decision of the Supreme Court of the United States in the case of *Furman* v. *Nichol*, 8 Wall., 44, is applicable to the present case.

It is observed that the first clause in the section above quoted gives the billholders of the bank preference over all other creditors, while the other clause secures to the billholders the right to pay their debts to the bank in the notes of the bank, as well after

as before an assignment by the bank. It is not our business to discuss the policy of this law, but to ascertain its true meaning and to execute it accordingly. Taking the two clauses of the section together, we are of opinion it was intended that whenever a bank should become insolvent, as in the case before us, the holders of the notes of the bank should have the right to pay their debts to the bank in its own notes, whether before or after an assignment. If the result is, that in the distribution of the assets of the bank, equality among the noteholders will be defeated, we can only say that the law is so made, and that the fact of giving preference to billholders over all other creditors shows clearly that equality in the distribution of the assets of an insolvent bank was not the rule adopted by the Legislature.

We are therefore of opinion that there was no error in the charge of the Circuit Judge, and that the plea of tender was properly found in favor of the defendant.

Several other questions have been discussed at the bar, which we have not noticed, for the reason that they are not raised in the pleadings. Some of these questions could only be raised if the State was properly a party, but having determined that the State is not a party, it would be manifestly improper for us to examine these questions. Among these is the question whether the State has a right to be substituted to the rights of the holders of the old issue, to the amount of that issue received by the State in payment of taxes; as also the question, whether the State is bound to receive the new issue in payment of taxes,

as ·she was bound to receive the old issue. As the State is not a party we have refrained from discussing or indicating any opinion upon either of these questions.

The result is that the decree of the Chancellor as to that branch of the case in which Atchison & Duncan are defendants, is affirmed to the extent herein indicated, and the cause is remanded to be proceeded in upon the principles determined in this opinion.

The costs of this court will be paid out of the assets of the bank.


Opinion by McFarland, J.

I propose to state my conclusions upon the various questions in these cases, without regard, however, to the logical or natural order in which these questions should be disposed of.

I am clearly of opinion that the fund belonging to the State, and known as the school fund, paid into the Bank of Tennessee, was paid in as part of the capital stock of the bank, and that the board of commissioners was fully authorized and required to do so by the charter of the bank. The language of the charter in this respect admits of but one construction. The fund was received and regarded as part of the capital. Without this, the fund would have been far short of the amount which the bank assumed to be its capital stock, and upon which its business was based.

I am further of opinion that there is nothing in sec. 10 of art. 11 of the Constitution of 1834 which

prohibited the Legislature from directing the investment of the school fund to be made in this manner.

The above section of the Constitution ordained that the fund should remain a perpetual fund, the principal of which should never be diminished by legislative appropriation, the interest to be inviolably appropriated to the support and encouragement of common schools, and that no law should be made authorizing said fund, or any part thereof, to be directed to any other use; and it shall be the duty of the General Assembly to appoint a board of commissioners, who shall have the general superintendence of said fund, and who shall make a report of the condition of the same from time to time, under such rules and regulations as may be required by law.

The fund belonged to the State, and was subject, previous to the adoption of the Constitution of 1834, to the absolute control of the Legislature. *McEwen v. The Governor*, 5 Hum. By the clause referred to of said Constitution, the power of the Legislature was limited so as to prohibit the appropriation of any part of this fund to any other purpose, and the interest absolutely required to be appropriated to the use of common schools. But, manifestly, in order to produce interest the fund itself must have been loaned or in some manner invested, and when invested, would be subject to all the dangers of loss attending like investments. The previous history of the State shows that the commissioners and other trustees holding common school and college or academy funds, were authorized to invest them in the stocks of various banks,

and that such investments were made. This invest-
ment of the school fund. must have been left abso-
lutely to the control of the board of commissioners
provided for, or ' to ° their control under the direction
of the Legislature. The General Assembly being the
supreme legislative power of the State, still retained
all power over the fund not taken away by the Con-
stitution. *McEwen* v. *The Governor*, 5 Hum.

The Legislature directed the investment to be made
in the capital stock of the Bank of Tennessee. The
board of commissioners complied with this direction.
The bank conducted its business and obtained credit
upon this basis. No question was ever made as to
the validity of these proceedings · until, by the misfor-
tunes of the late civil war, a large part of the assets
of the bank were lost, rendering it insolvent. This
investment of the fund has been too long acquiesced
in by every department of the State Government to
be now questioned.

I am clearly of opinion that the board of school.
commissioners, controlling this fund on behalf of the
State, did not and could not occupy the attitude of a
creditor of the bank as a depositor of the fund, but
must stand, in respect to this fund, in the attitude
of a stockholder, and its rights in conflict with the
creditors must be determined upon this basis. And,
therefore, the act of February, 1866, and the deed of
assignment thereunder, so far as they assume to secure
to the State or the school commissioners the payment
of $1,500,000 as a preferred *debt* out of the assets of
the bank, are inoperative and void, upon the plainest

State, and Watson, Trustee v. Bank of Tennessee.

principles of fundamental law. *Curran* v. *The State of Arkansas*, 15 Howard, 304.

When the bank became insolvent, the conflicting rights of its various creditors, and the State as stockholder, were questions for the courts, to be determined in accordance with the laws then in force. It was not the province of the Legislature to legislate upon the subject. A law assuming to declare or settle the conflicting rights growing out of these past transactions, is manifestly *ex post facto*. The State being the only stockholder, the Legislature might direct the bank to make an assignment, and give any other direction not in conflict with the existing laws and the vested rights of others, as the stockholders of any other bank might do. In this view the act of February, 1866, must be regarded. But so far as it assumes to *be a law* determining the rights of the various parties growing out of the previous transactions, it is a nullity.

The next question is, could the bank by its deed for the benefit of its creditors, independent of the force of the act of February, 1866, under its general powers, prefer one class of creditors over another, contrary to the then existing laws?

I have said that the provision of the deed securing to the State $1,500,000 for the school fund, is void, because the State is not a creditor. But the deed following the act of February, 1866, also provides, in the second class, for the payment of the noteholders and other creditors upon the same footing, excluding, however, all noteholders whose notes were

5—VOL. 5.

issued after the 6th of May, 1861, and all creditors who became such after that date. It is not denied that, under the banking code previously in force, the note or billholders of a bank are preferred over the other general creditors. If the debts and notes excluded were illegal and void, then, of course, there could be no objection to the clause of the deed excluding them. But, for the present, assuming that these debts or notes are not void, may they be excluded by the bank in its deed simply giving preference to the other creditors, under the general power which a debtor has to prefer one creditor over another?

The charter of the Bank of Tennessee had not then expired, but the bank had entirely ceased to do business, and it was manifestly impracticable for it to resume. It is admitted to have been wholly insolvent. The act of the 16th February, 1866, before referred to, declares it should no longer do business, but go into liquidation. I see no objection to that part of the act declaring the bank in a state of liquidation and directing an assignment.

The bank from that time only existed for the purposes of liquidation. The persons appointed by the act as directors to make the assignment were vested with no discretionary powers. The assets of the bank then became a trust fund, to be held for the benefit of its creditors, according to their rights as then fixed.

And, in my opinion, the provision of the deed excluding entirely one class of creditors—if, in fact, they be creditors—cannot be sustained upon the ground that

the bank, as a debtor, has the right to prefer one creditor over another. This principle does not, in my opinion, apply to a defunct and insolvent banking corporation, so as to enable them to deprive any portion of its creditors of their rights according to the existing laws. See *Marr* v. *The Bank of West Tennessee*, 4 Col.

Mark R. Cockrill, by his cross-bill, claims to be a creditor of the bank as a depositor, and seeks to have the assets of the bank administered according to the rights of the parties, through a receiver, and especially attacks the provisions of the assignment securing $1,500,000 to the State, and excluding the depositors who became such after May 6, 1861.

A demurrer to this cross-bill by the trustee, raises the question as to the validity of the provision securing the school fund to the State, and the power of the bank to exclude the complainants as creditors.

As I have said, these questions, in my opinion, should be determined in favor of Cockrill, and the demurrer overruled.

But the demurrer also raises the question whether Cockrill is a creditor of the bank. His deposits were made principally after the 6th of May, 1861. This question has been argued in connection with the claim of Duncan and Atchison, who come in by answer, and claim to be holders of certain of the notes of the bank issued after the 5th of May, 1861.

It has been assumed in argument that claims for deposits made after the 6th of May, 1861, as well as notes of the bank issued after that date, were declared

State, and Watson, Trustee *v.* Bank of Tennessee.

void by the Schedule to the amended Constitution of 1865, and the validity and effect of these provisions has been ably discussed. But, in my opinion, the Schedule referred to does not declare void the claims of depositors after that date. Sections 5 and 6, bearing upon the question, are as follows:

Sec. 5. "All laws, ordinances and resolutions, as well as all acts done in pursuance thereof, under the authority of the usurped state government, after the declared independence of the State of Tennessee, on or after the 6th of May, 1861, were unconstitutional, null and void"—with a proviso in favor of the validity of judicial proceedings.

Sec. 6. "All laws, ordinances and resolutions of the usurped state government passed on or after the 6th of May, 1861, providing for the issuance of state bonds, also all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th of May, 1861, and all debts created or contracted in the name of the State by said autherity, are unconstitutional, null and void, and no legislature shall hereafter have power to pass any act authorizing the payment of said bonds or debts, or providing for the redemption of said notes."

So it will be seen, that while the notes of the bank issued after the 6th of May, 1861, are expressly declared void, other contracts of the bank are not referred to. The language, "and all debts created or contracted in the name of the State by said authority are unconstitutional," &c., has reference to debts created or contracted in the name of the State by au-

State, and Watson, Trustee *v.* Bank of Tennessee.

thority of laws, ordinances or resolutions of the usurped state government, and can have no reference to an ordinary deposit in the bank by a private individual, for such contract would not ordinarily depend for its validity upon any law or act of the usurped government. It results, therefore, that as to these depositors, their claims are not in any aspect affected by the Schedule referred to; for the argument concedes that transactions of an ordinary character during the late war, where the political power of the successful government has not elected to treat them as void, should be regarded as valid. These claims, therefore, are not void, for the reason urged.

The question, however, remains as to the notes of the bank issued after the 6th of May, 1861, called the new issue. These were declared void by the Schedule referred to. The defendants Duncan and Atchison are holders of some of these notes, and set up their claim by answer. They profess to answer for themselves and all other holders of the notes who may elect to come in under the decree. But I know of no law or practice for this course, and I think no decree can be made affecting any part of the issue except it be the particular notes of Duncan and Atchison. This question has been discussed with great ability. The argument against the validity of these notes may be briefly stated as this: From and after the 6th of May, 1861, until after the close of the war, Tennessee was in a state of insurrection and rebellion against the federal government. The several departments of the state government refusing to recog-

nize the federal authority, became unlawful, and from that time ceased to be the rightful or lawful government of Tennessee. As a result of this, upon the successful prosecution of the war by the United States, and the restoration of a government in the State in harmony therewith, all the acts of the usurped government and of its citizens during the rebellion were void, if the restored government chose to so regard them. What acts shall be regarded as valid and what void, are questions of policy for the political department of the restored government to determine, and in this the courts must recognize and follow the action of the political department. That the Schedule to the amended Constitution of 1865 was the action of the political department of the State Government, electing to regard the acts therein specified as void, and, by implication, all others as valid—that this was followed by the action of the United States Government, through its political department, in restoring the new State Government to its federal relations upon this basis; and the courts must follow this action, and treat as void all acts so declared to be.

There can be no doubt that the foregoing is, upon principle, the true theory where one government is subverted and overthrown by another, *at least so far as the acts of the subverted government are concerned, or the acts of its citizens in pursuance thereof.*

We must adopt as the true one the theory of the United States Government in regard to the character and effect of the late war. According to that theory, the public officials having possession and control of

the Government of Tennessee from and after the 6th of May, 1861, ceased to be the true and lawful Government of the State. It is true that the officers of the State were lawfully elected, and in all matters of mere local government there was nothing in itself unlawful in their acts; but the refusal of the State authorities to recognize the authority of the Federal Government, and their action in joining the organized efforts to establish another general government, brought these state authorities into direct conflict with the Federal Government. The result was, that the war was prosecuted to remove these obstructions to the exercise of the supreme federal authority. To do this, it was necessary to remove all the incumbents of the State Government, and overthrow and destroy their power and authority. This was done by the military power of the general government, and the place supplied by a military government during the war. The result of this was, to establish that the aforesaid State Government was unlawful from and after the date the hostile attitude was assumed. And although it is true that the only acts of the authorities of Tennessee unlawful in themselves consisted in denying and resisting the federal authority, and in carrying out this resistance, still the result was to make the government unlawful *in toto.* I mean by the government, the public officials having control thereof. It could not be regarded as lawful in matters of local government, and unlawful only in its federal relations. Its attitude towards the Federal Government made it necessary for the latter government to refuse to recognize

State, and Watson, Trustee *v.* Bank of Tennessee.

it as the true Government of Tennessee, and to displace it by force—there was no other remedy. When this was done, and a government restored which the Federal Government recognized as the true one, it might, in my opinion, treat as void any and all acts of the unlawful government during the time it was in power. As a matter of policy, it would certainly be better to treat acts of mere local government, having no relation to the war, as valid. But this would be a question of policy for the political power of the restored government to determine, and the courts would have to follow their decision. If the restored government should declare certain acts of the unlawful government void, this might well be taken by the courts as regarding all other acts, not unlawful in themselves, as valid. As the Federal Government refused to recognize the Government of Tennessee as lawful from and after the 6th of May, 1861, the courts cannot, as a matter of law, determine the contrary, and must hold all its acts void, unless the political power of the restored government has elected to treat some of these acts as valid. So, in my opinion, in regard to the acts of the unlawful government, its laws, resolutions, &c., all the courts can do is to determine how the political power of the government has elected to treat these acts.

The Schedule to the Constitution of 1865 declared void all acts and resolutions of the unlawful government, bonds issued, and debts and obligations created by it, and also declared void notes issued by the Bank of Tennessee after that date.

Now, does it follow that because the Government of Tennessee was unlawful after the 6th of May, 1861, all the acts and contracts of citizens are invalid, at the option of the new government?

I cannot see that this result follows.

Tennessee existed as one of the states of the Union before the rebellion; it continued so during the rebellion. In the language of Chief Justice Chase, in *Texas* v. *White,* "the obligation of the State as a member of the Union, and of every citizen of the State as a citizen of the United States, remained perfect and unimpaired. It certainly follows that the State did not cease to be a state, nor her citizens to be citizens of the Union." 7 Wall., 721. It is certainly true, however, that the corresponding right of the citizens of the State to the protection of the laws of the United States was, for the time of the rebellion, suspended. They were all treated pending the war as enemies, without regard to their individual conduct or sympathies. So, a citizen of one of the rebel states, although in fact a loyal man, could not, pending the war, have a status in a United States court. But this was a mere suspension of the right. When the state of war and the enemy relation ceased to exist, his status as a citizen was restored, and then he was entitled to the protection of the law, though perhaps subject to punishment; and the question is, is a contract made between two citizens of a rebel state during the rebellion, of an ordinary character and lawful in itself, protected by the Constitution of the United States from being impaired by state legis-

lation or constitutional change? Is the citizen now entitled to this protection, notwithstanding the fact that at the time the contract was made the state authorities and the citizen himself were in rebellion against the government whose protection he now claims? I think he is. The only effect of the war in this respect was, that during its pendency the citizen of the rebel state was treated as an enemy; but he is now restored, and their ordinary contracts stand upon the same footing as if made in a loyal state. Their contracts did not depend upon any law or act of the usurped state government—they would be governed by the laws previously in force. This conclusion, I think, is sustained by the case of *Walker* v. *Whitehead*, 16 Wall., 315, and by the reasoning in *White* v. *Hart*, 13 Wall., 651. So that, I conclude, all the acts of the usurped or unlawful Government of Tennessee, after the 6th of May, 1861, were void, except such as the restored government, upon grounds of policy, elected to treat as valid; saving, also, the protection due the citizen for obedience to its laws as a *de facto* government; also, all acts or contracts of citizens in furtherance of the acts of the unlawful government, or dependent upon these acts or laws, are subject to be treated as void, at the option of the restored government.

On the other hand, contracts between individuals in the ordinary course of business, not founded upon or in furtherance of any act or law of the unlawful state government, though made in a rebel state and during the rebellion, must now be enforced in accord-

State, and Watson, Trustee, v. Bank of Tennessee.

ance with the laws rightfully in force at the time, and neither a state legislature or convention can declare the contract void.

The question then arises, to which class does the notes of the Bank of Tennessee issued after the 6th of May, 1861, belong?

The Bank of Tennessee was chartered long before the 6th of May, 1861, and was in existence by the laws then in force. Its powers were defined, one of which was to issue notes to circulate as money, and it would seem that it might continue to do business and make contracts within the powers conferred by the charter, during the rebellion as natural persons or other banks might do.

There was however this difference. The Bank of Tennessee was owned exclusively by the State, and was its fiscal agent; its directors and officers were appointed and controlled by the state authorities. When the state government assumed a hostile attitude to the federal government, and war became flagrant, the possession and control of the state bank became of the utmost importance. That the usurped government of Tennessee exercised complete control of the bank, and directed its policy in regard to furnishing the State the funds demanded, can admit of no doubt. The military board drew from the bank $4,625,460.48 for war purposes. This, or the greater part of it, was paid by a sale to the bank of the bonds of the State authorized by the Legislature, known as war bonds. These bonds are void, being unauthorized, and under the 14th amendment of the Constitution of the United

State, and Watson, Trustee *v.* Bank of Tennessee.

States cannot be voluntarily assumed by the State. To my mind it is comparatively immaterial what were the purposes and political views of the individuals composing the directors and officers of the bank in these transactions, it was in the nature of things impossible for the bank to maintain a policy in this respect at variance with the will of the controlling authority of the state government. The funds of the bank were needed by the then state authorities; the struggle then beginning was regarded as an issue of life and death; the people of the State were moved with intense feeling; the State was an armed camp, and it is idle to suppose that the state authorities would have brooked any opposition upon the part of the officers of the bank to the use of the funds, which belonged to the people of the State, and which it was then assumed were needed for the common defense.

This transaction, by which over $4,000,000 of the funds of the bank were taken and the war bonds of the State substituted, was, in substance, the act of the then existing state government, and the present government and people of the State would not be bound by this transaction if there was any remedy, but the only remedy as to this is to repudiate the war bonds—the money drawn from the bank cannot be recovered.

The next step in these transactions was the making and issuing the new issue of the bank. The question has been discussed as to whether these notes are not void, because made and issued for the illegal purpose upon the part of the bank of aiding the rebellion. Upon this question of fact all that can be said, is that

the drafts of the military board upon the bank were so heavy, and reduced the currency so greatly, as to make it necessary, in order to meet these drafts and keep up the ordinary business of the bank, to make these new notes. It is not probable that any considerable part of these drafts of the board were paid with the new issue, as it seems that most of the drafts were paid before the new issue was made

The notes when made were paid out indiscriminately as other funds.

There is clearly nothing to show any illegality in the contract of paying out the notes involved in this cause; so if the act of making the notes is not in itself illegal, they must be treated as the other notes of the bank.

Could the Bank of Tennessee lawfully make new notes to issue and circulate as money during the time it was under the control of the unlawful state government?

There is nothing to show that in making these notes the bank exceeded the power of the charter. Did the fact that the then state government was unlawful deprive the bank of the power to make new notes? As I have said in my opinion it did not deprive individuals of the power to make ordinary contracts, or make them void at the option of the restored government. And it seems equally clear that ordinarily artificial persons, corporations in existence under previous laws, might, within the powers of their charter, continue during the rebellion to make contracts, which should now be protected and enforced, and which should

not be impaired by State Constitutions. On the other hand the restored state government had the unquestioned right to say that the State or people shall not be held bound by any act done, or obligation assumed by the overthrown state government during the time it has been determined to be unlawful, and without authority to bind the people of the State. A bond issued or debt contracted by that state government does not bind the present government unless voluntarily assumed.

Had the State Government, after May 6, 1861, issued any obligations allowed by the Constitution, these obligations would not be obligatory upon the present government or the people of the State, unless voluntarily assumed.

How far, and to what extent was the act of making these notes by the bank, the act or obligation of the State? The authorities referred to clearly show that a state bank possesses none of the sovereignty of the State. For the purposes of making contracts and enforcing them, the State and its bank are essentially different. The State occupies toward such a bank more the attitude of sole stockholder. The bank and State are however identical in interest. Every note made and issued by the bank indirectly affected the State—the assets of the bank which belonged to the State were bound for its payment, and further, by a provision of the charter, the State was bound to accept the notes of the bank in payment of taxes, and it is also argued that the State has by the charter guaranteed all the notes of the bank. As to this I express no opinion. It is clear however that a note made and

issued by the bank was an indirect obligation of the State, and if redeemed, is indirectly redeemed by the State, but directly it is the obligation and contract of the corporation created for this purpose, and stands upon the footing of contracts by other banks or corporations.

This brings us to this proposition: Had the restored State Government the right to repudiate the act of the state bank in making these notes upon the ground that the officers of the bank were agents and *quasi* officers of the State, holding their offices by the appointment of the State Government, and when it became unlawful and without rightful authority, these officers of the bank lost their rightful authority to act for the bank and indirectly bind the true State Government by their acts. In other words they became the directors, holding under the authority of the usurped government, and representing it, but without authority to do any act binding the true State Government upon its being restored. Upon this ground it is argued that the acts of the bank in making these notes might be repudiated, otherwise the directors of the bank, holding during the rebellion, and acting in obedience to the will of the rebellious government, had the power to subserve the ends of that government, and yet bind the restored government to abide their acts; to use the old notes and other funds of the bank for war purposes; supply their place in business with new notes, which the restored State Government would be bound either directly or indirectly to redeem, unless it could be shown the making the new notes was for the specific purpose of aiding the rebellion, which in the

nature of things it would be difficult to show. The entire circulation of the bank might have been used for war purposes, millions of new notes made and issued, the present State Government bound to redeem them either directly or indirectly, although the entire transactions were had by officers of the bank holding under and subserving the ends of the usurped State Government, and when the lawful State Government was without power to prevent it. The directors may have been lawfully appointed; their acts as to these notes, within the powers of the charter; and it may be impossible to affirm that they made these notes with the specific purpose of aiding the rebellion. Yet for all this, they represented the usurped State Government, acted for it, and in obedience to its will, and subserved its purposes. So far as the bank acted for the State, it was for this unlawful State Government, and as a result of this the restored State Government had the right to repudiate the act, upon the ground that these officers of the bank were without authority to bind the State in their behalf.

Whether this argument would lead to the conclusion that all the ordinary acts of the bank in banking business might be repudiated, need not be considered, as no attempt has been made to repudiate these acts; on the contrary, they have, by implication, been treated as valid.

The result of this would be that the restored state government would have the right to repudiate all obligation growing out of the acts of the state bank under the direction of the overthrown state govern-

State, and Watson, Trustee, *v.* Bank of Tennessee.

ment. To this conclusion I am strongly inclined. This would mean simply that the present state government is not bound by obligations assumed by the overthrown government, either directly or indirectly, by its agent the bank.

This brings us to the question whether the State has repudiated these notes. It did so by the schedule to the amended Constitution of 1865, but this schedule was abrogated by the Constitution of 1870. So we now have no act of the political department declaring these notes void. So this seems inevitably to bring us to the conclusion that this is a voluntary election by the political power of the State to regard all these acts as valid. The Constitution of 1870 certainly was intended, and had the effect, to remove altogether the effect of the schedule of 1865. See 6 Heis., 79.

Upon this the question may arise as to the title of the trustee, acquired while the Constitution of 1865 was in force. While the Constitution of 1870 may revive the liability of the bank, it may or may not affect the right of the holders of these notes to participate in the assets; but this question, I think, does not now arise, for the reason, elsewhere shown, that the present parties are only in a condition to have their right as a creditor of the bank declared.

The constitution of 1870, having the effect to remove the only act repudiating these notes, we come back at last to the question whether the State, under the fourteenth amendment of the Constitution of the United States, is forbidden to assume these obligations

6—VOL. 5.

upon the ground that these are debts or obligations incurred in aid of the rebellion.

As already intimated, although the officers and directors of the bank were necessarily subject to the will of the state government in power, yet it cannot be shown that there was any illegality in itself in the act of making and paying out these notes more than in any other act of the bank in its usual business. Conceding that the liability of the State might be repudiated, the political power of the State does not now repudiate it, and the State may as well treat this as valid as any other act of the bank. It is no more an illegal debt than any other liability of the bank contracted during this period. I conclude, therefore, that the notes in question are valid obligations of the bank.

As has been already intimated, no decree can be made as to any of the holders of the new issue, except Duncan and Atchison, no others are before the court.

And further, Duncan and Atchison only come in by answer to the original bill. That cause has not been heard in the court below, except as to this question. That being a bill by the trustee for directions in administering the trust under the deed, no decree can be made in favor of Duncan and Atchison setting aside the deed of trust in their favor without a bill filed by them for that purpose, or at least until they appear in some other mode than by answer to the original bill. No issue of this sort can be made by an answer to the original bill. Their right, however,

may be declared, leaving them to such remedy as they may see proper to pursue.

I am of opinion that the decree declaring the right of the holders of the new issue to pay their indebtedness to the bank in said notes is, in any aspect, erroneous.

Without considering whether the 30th section of the act of 6th February, 1860, has been fully repealed by subsequent acts, I am of opinion that a proper construction of that section does not allow the debtor of an insolvent bank to meet his indebtedness by a tender of the notes or bills of the bank after a general assignment for the benefit of creditors. The manifest object of the act was to give the noteholders of an insolvent bank preference over other creditors, and *to make them equal with each other*, and that no assignment of the paper of the bank to any third party should deprive the debtor of his right to pay in the notes of the bank. Subsequent to this, and before the present assignment was made, all banks in the State were authorized by the act of June 8, 1865, ch. 55, to make assignment for the benefit of creditors, giving preference to billholders. To allow the constructions contended for would defeat the manifest object of these laws, which is to divide the assets of an insolvent bank *pro rata* among the creditors, giving preference to billholders.

If the assets of the bank be $100,000, consisting in debts due, its outstanding bills amounting to $200,000, the debtors may pay their indebtedness with $100,000 of the bills of the bank. This would ex-

haust the entire assets, and as a result these debtors would realize the full amount of the $100,000 of the bills of the bank held or procured by them, while the holders of the other bills would get nothing, and thus the equality would be entirely defeated. So, in my opinion, the debtors of the bank could have no right to pay their debts with the notes at the bank, unless it be to the extent of any *pro rata* to which they may be entitled.

I am of opinion the State is not a party to these proceedings in such manner as to authorize any decree adjudging the liability of the State upon any of the grounds claimed. The State is sovereign, and its own courts cannot treat it as a party litigant, and render judgments or decrees against it, except so far as is expressly allowed by statute. And there is no statute now in force allowing the court to adjudge these questions.

I am further of opinion that the public officials of the State are not liable to suit for their acts done under the authority of valid laws of the State.

The seizure of the assets of the Bank of Tennessee by officials of the State, under the direction of the Legislature, was justifiable only for the purpose of saving the assets, and taking care of them under the anomalous state of things then in existence, there being some doubts whether there was any officers of the bank rightfully entitled to the custody of the assets; but this could only justify their holding of these assets so long as the emergency existed, and then the assets should have been turned over to the proper official or the

trustee. So far as the act of the Legislature assumed to authorize these assets of the bank to be held by the officers of the State as part of the school fund, or as funds belonging to the state treasury, the act is unconstitutional and void. And, in my opinion, any of the officers of the State having the custody of these assets may be compelled, under the order of the court, to deliver them up to the receiver, or such other person as the court may direct. The law under which the officers may now claim to hold these assets for the State is unconstitutional and void.

The question has been argued whether the State has the right, in the distribution of the assets of the bank, to be substituted to the rights of the noteholders in respect of the notes of the bank which the State has taken up in payment of taxes, under the provision of the charter refurred to. This question is not now involved, as the bill upon behalf of the State seeking this relief has been dismissed.

Upon other questions I concur in the opinion of the Chief Justice.

Opinion by TURLEY, Sp. J.

A number of important questions are presented by the record in this cause, all of which will be left to the opinions prepared by members of the regular court, except the one involving the right of the defendants, T. A. Atchison and W. M. Duncan, to set up and have declared valid the bank notes held by them, popularly called "New Issue." In treating of the subject reference will be had to the new issue gener-

ally, but this will be only for convenience, the application being intended for the claims in the hands of these two defendants, in the form and accompanied by the facts disclosed in this particular case, and limited also to their rights, if any, as against the assets of the bank.

The General Assembly of the State of Tennessee, on the 19th day of January, 1838, passed an act to establish, for the benefit of the State, a bank, to be known by the name and style of "The Bank of Tennessee." The act seems to have been prepared with great care, and is quite elaborate in its details, but for the purposes of the present decision its provisions need not be set out further than to show that the directors were to consist of twelve persons, to be nominated by the Governor and confirmed by the General Assembly, one of whom should be president, and to continue in office for two years, and until their successors were nominated and confirmed, and that the State was to be the sole stockholder, and the corporation to continue until the 1st of January, 1868. The privilege of issuing bills for general circulation under certain restrictions, and the other franchises usual in charters for banking institutions, were granted. The board was in due time organized, and the bank went into successful operation, and so continued till the breaking out of the late civil war. Previous to the 1st day of January, 1860, a new board of directors had been appointed, as required by the charter, who went into office on that day, and they were the directors who had control of the bank at the time the notes in

question were issued. But G. C. Torbett, the president who signed the bills, for some cause not explained by the record, was not elected till the 9th day of May, 1861. In the absence of anything to the contrary, the presumption is he was at the time a member of the board, and regularly elected and installed into the office of president.

On the 6th day of May, 1861, the Legislature of Tennessee passed an act entitled, "an act to raise, organize and equip a provisional force, and for other purposes," in which direction is given for the issuance of State bonds to the amount of five millions of dollars, which were to be placed at the disposal of a military board, and by them to be used for the purpose of prosecuting a war against the authority of the United States Government. The bonds were accordingly issued, and a very large amount of them sold to the Bank of Tennessee. By an agreement of facts, signed by counsel, it is admitted "that the ordinary and then issues of circulating notes of the Bank of Tennessee and its branches were insufficient to meet the usual banking business of the bank in 1861, and drafts or checks drawn upon the bank by the military board, and that the bank was compelled, in order to meet its regular business and the demands of said board, to resort to the issuance of the bank notes now in controversy, known as the 'new issue' of said bank, and that said notes constituting the 'new issue' were all put in circulation after the 6th of May, 1861, and for the purposes aforesaid."

Inasmuch as the officers who controlled the assets

and franchises of the bank at the time these notes were
created and issued had received their appointment in
a regular and legal manner, pursuant to the charter,
and there is nothing on the face of the notes them-
selves to indicate they are not genuine, they may prop-
erly be treated as *prima facie* good, and their validity
will depend upon the soundness or unsoundness of the
objections brought against them.    These objections are
numerous, and have been maintained and resisted in
argument with marked zeal and ability.

They may be divided into two classes, one based
upon the ground that although the notes in their in-
ception may have been valid, yet the courts must hold
them void, because they have been so declared or
treated by the political departments of the government;
the other, that they were void from the beginning,
and independent of all subsequent action affecting their
validity.

Prominent among objections belonging to the first
class named is the one that these notes are reached
by the terms of the fourth section of the fourteenth
amendment of the Constitution of the United States.
A portion of that section declares that "neither the
United States nor any other State shall assume or pay
any debt or obligation incurred in aid of insurrection
or rebellion against the United States."    The result
of the war determined the rebellion was unlawful, and
as a necessary consequence, all debts or obligations in-
curred in aid thereof are void.    The fourteenth amend-
ment, then, can have no influence with the courts,
because what it declares, they would hold independent

of any such direction, upon the well established general principle that contracts contrary to law or public policy cannot be enforced in courts of justice. In its bearing on the legislative department of the States, the amendment may impose important restraints, but with that, for the present, we have no concern. It is sufficient to say, if the contracts in question are shown to be "obligations incurred in aid of insurrection or rebellion," they must be declared illegal and void, independent of constitutional change or legislative enactment. Whether, in point of fact, they were thus incurred, is a question in the solution of which the amendment itself gives us no aid, and it may, therefore, be dismissed without further consideration.

But the State, both by its Legislature and in Constitutional Convention, has taken direct action on the subject of these notes, and the effect of that action is now submitted for determination. The sixth section of the schedule to the constitutional amendment, passed in February, 1865, provides that "all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th of May, 1861," are unconstitutional and void. Counsel who advocate the efficiency of this constitutional condemnation of the new issue, and insist it must be enforced, do not claim that a State Constitution, any more than a state law, can violate the Constitution of the United States by impairing the obligation of a contract. They concede the power on this subject, in a State Constitution, stands on a level with the power in a State Legislature, or in the Congress of the United States. The Legislature of Ten-

nessee, by the act of February 16th, 1866, ch. 28, declared all issues of the Bank of Tennessee, signed by G. C. Torbett, utterly void. The effect of the Constitutional amendment being the same as this act, the disposition of the one will settle the other.

The question then is, are these notes notes void because so declared by the legitimate government of the State of Tennessee? The argument that they are, ·if correctly understood, is that the right thus to treat these notes was derived from success in arms—the belligerent right of the conqueror to dispose, at pleasure, of the property of the vanquished. Waiving for the present the question of law, the position, as it respects the State, is not tenable, because not warranted by the facts. The State Government of Tennessee has no belligerent rights growing out of this war, because it was not a belligerent party. The war was one waged by the United States on the one side against the so-called Confederate States and the rebellious states on the other. There was some separate state action by a portion, if not all of the states that adhered to the Union, but none by the legitimate government of Tennessee. The part Tennessee took in the struggle, as a state, was against the government that finally triumphed. What is termed the legitimate government of the State of Tennessee had no organization during the contest until it had almost closed, when the conquering armies needed no aid from such a quarter, and received none. The successful belligerent was only represented in Tennessee during the war by a military Governor, whose authority emanated from the

general government, and by the military power that sustained him. The State of Tennessee, since the restoration of peace, has assumed none of the duties which rest upon a government after a successful war, such as paying the war debt, pensioning soldiers, etc., and has no claim whatever to corresponding rights. It follows, therefore, that neither the constitutional amendment, nor the act of the Legislature, affects the validity of these notes, the State having no belligerent right that can be interposed as a barrier to the operation of the tenth section of the first article of the Constitution of the United States.

It is again urged that the government of the United States has treated these obligations in the same manner as they were treated by Tennessee, and the right and power to do so without constitutional hinderance is referred to the same principle. But a fatal objection to this position is, that Congress has at no time, either in express terms or by implication, declared the bank bills called new issue void. The joint resolution passed July 24th, 1866, restoring Tennessee to her rights in the Union, which is relied upon as having the effect of making the action of the State the act of the general government, cannot be so construed. This question was brought before the Supreme Court of the United States in *White* v. *Hart*, 13 Wall., 646, and it was there held, substantially, that the act of Congress of June 15, 1870 (16 Stat. at Large, 363, 364), by which the State of Georgia was declared to be entitled to representation in the Congress of the United States, did not amount to an approval by Congress of

all the provisions contained in the Constitution of the State, or make them the act of Congress itself.

But if Congress had, in express terms, taken the same action on the subject that was taken by the State, or if the State of Tennessee had been the successful belligerent in the late war, even then the courts could not sustain such legislation. To avoid the constitutional objection, it is argued that all acts of the rebel government and of its citizens, while in rebellion, were illegal and void because done without the pale of the Constitution and laws from which they had withdrawn; and that the ordinary contracts between individuals can be sustained only because they may be considered as validated by the conquering government, if it takes no action in regard to them. But if the political department of the conquering government shall remove the presumption arising from silence, and expressly declare that any particular acts or contracts are *not* validated, such action will be conclusive on the courts. To sustain this we are referred to the case of *Luther* v. *Borden,* 7 How., 1. In that case it was held, that, so far as the United States was concerned, it belonged to the political department of the government to determine whether a government of a state was a legal and duly constituted government; and, so far as the State was concerned, the courts of the United States would adopt the holding of the courts of the government which was finally settled in authority. No act of Congress or of the Legislature of Rhode Island, containing any such doctrine as that under consideration, passed un-

der review of the court in that case; nor did the court announce any principle which could be construed into the recognition of a power in the legislature, either state or federal, to declare contracts between private individuals invalid merely because they may have been entered into while the parties were engaged in insurrection against the rightful government.

The learned counsel have also cited the case of *Ingram* v. *Cocke*, 1 Tenn., 22. This case involved the validity of a sheriff's sale under the authority of proceedings had in one of the courts held under the Franklin Government. Shortly after the close of the revolutionary war, the citizens of the counties of Washington, Sullivan, Greene and Hawkins, in the State of North Carolina, in a peaceable manner, but without the consent of the mother state, formed for themselves an independent government, called the State of Franklin. This assumed government exercised the sovereign powers of a state for a time, and then the people voluntarily relinquished its authority and placed themselves again under the state from which they had seceded. The Legislature of North Carolina, by act of 1786, ch. 23, Iredell's Revisal, p. 597, granted a pardon to all persons who had in that way withdrawn their allegiance from the State. It also relinquished to them all taxes due from the end of the year 1784 to the date of the passage of the act, and provided, "That where any decisions have been had respecting property which are incompatible with justice, the person or persons injured shall have his or their remedy at common law." Thus it will be seen the Legisla-

ture of North Carolina assumed to exercise no power over contracts, or the rights of property, as between individual citizens. The granting of pardons and the relinquishment of taxes were matters pertaining to its own rights, and were acts of which no one could justly complain. What it directed as between individuals was, they should have trial at common law in cases where the decisions of the courts under the usurped government had been incompatible with justice. The language of the court in the case referred to must be construed in reference to the law and the facts then under consideration. Judge Overton, in delivering the opinion of the court, said: "When governments *de facto* cease to exist, the former or legitimate government, by their legislative acts, usually furnish the grounds upon which municipal courts proceed in giving an opinion." The court then, in obedience to the legislative mandate, holds the decisions of the Franklin courts binding on the parties, unless incompatible with justice. This was a question as to the validity of a judicial proceeding in a court not only held under, but created by, an unlawful government. No case has been cited, or authority of any kind referred to, which goes the length assumed in behalf of the bank, and this court will not be the first to maintain a doctrine so rigorous in its nature and so little in accord with the liberal and humane spirit which pervade the rules of international law and belligerent rights in modern times.

The right of governments to declare forfeitures and confiscate the property of criminals, is not questioned;

but that is a subject which need not be discussed, as no question of the kind is raised by the record in this case.

If these views be correct, the bank notes called new issue have not been affected by any action of the government, either state or national, had since their issuance.

But it is said the action of the political department of the State, and the sanction thereof by Congress, may be regarded as only declaratory, for the notes in question were void from the beginning, and for that reason cannot be enforced; and the grounds for this position constitute the second class of objections.

Reserving for the present the question raised in one branch of this case, as to the liability of the State to account to the creditors of the bank for the consideration paid for the war bonds, there can be no question that the contract by which the military board sold and the bank purchased these bonds, was illegal. The courts could give no countenance to any proceeding against the bank the object of which might be the enforcement of any part of this contract, nor would they maintain any suit in favor of the bank to enforce payment of the bonds, because it was clearly a contract in aid of the rebellion, and therefore illegal and void. *Horn* v. *Lochart et al.,* 17 Wall., 570. This being settled, the somewhat intricate question arises, whether these notes bear such relation to this illegal transaction as to infuse into them the like taint of illegality, and thus render them also void. The

proof shows the bank entered into the contract for the purchase of these bonds to such an amount as to make it necessary to enlarge the volume of its circulation in order to enable it to keep the engagement, and also keep up its ordinary line of discounts. Hence the creation of the new issue. It does not appear that, in quantity or otherwise, the bank exceeded the restrictions of the charter in issuing these bills, or that anything objectionable attended the transaction other than the fact that an illegal contract was entered into, and these notes were created and used in part in fulfillment of that agreement. It is rather remarkable, considering the immense quantity of bank bills used in business life, that this exact question has never been settled. We say never settled, because no such case has been cited, and it may well be assumed that if any such existed it would have been brought to the notice of the court by the very learned counsel who have favored us with such exhaustive briefs upon the one side and upon the other. In the absence, however, of precedent, we may, by the application of well known principles, illustrated by analogous cases, be guided to correct conclusions. Counsel have referred to Confederate notes for illustration, and properly assume that while they may be treated as a valid consideration as between individuals, they would be void as between the holder and the maker. But this case is not similar to that, because the Confederate Government was itself an illegal combination, and had no right to issue notes for any purpose, whereas the bank had a legal existence, and could

State, and Watson, Trustee v. Bank of Tennessee.

lawfully create and put in circulation its notes for some purposes at least. Again, we are referred to cases in which corporations issued circulating notes, but without any such power having been conferred in their charters. But these cases are liable to the same objection that applies to Confederate notes. Another class of cases are referred to, in which corporations entered into contracts such as came clearly within their corporate powers, but were relieved from liability because the contracts were illegal or contrary to public policy. Here, too, the analogy fails; for, although in some respects the rules of law applicable to bank bills, and those applicable to contracts to pay certain individuals, such as promissory notes, are the same, yet in other respects there is an obvious distinction between them. "Bank notes differ essentially from promissory notes and other negotiable securities for money. They are not, properly speaking, evidences of debt or security for money, but are treated as money." *F. & M. Bank of Memphis* v. *White*, 2 Sneed, 482; *Murry* v. *Lardner*, 2 Wall., 110; *Miller* v. *Race*, 1 Burrow, 452.

But it is insisted these notes are void in their very inception, because their creation was occasioned by the exigencies of the war then flagrant, and to fulfill a contract that could not be complied with except by the doing of an unlawful act. The bank directors in ordering the preparation of these notes, it is urged, exceeded the authority conferred in the bank charter, because that must be construed as only conferring such power in the promotion of legal contract and legitimate

business, and consequently the making of bank bills, and passing them to the cash account with a view to their being used in fulfillment of an illegal contract was *ultra vires* and therefore void.

Illegal executory contracts entered into by corporations will not be enforced either against them or in their favor, and in this respect corporations stand on a footing with natural persons. But after such contracts have been executed and thus extinguished, property acquired through their means will be protected, and the rights of parties adjusted without reference to the nature of a non existing contract through which the property may have been acquired. *Brooks* v. *Martin*, 2 Wall., 70.

Nor can it make any difference in principle whether a transaction, innocent in itself, yet bearing some relation an to illegal contract, precede or follow such contract; if it form no part of the contract itself it will be recognized and sustained. *Armstrong* v. *Toler*, 11 Wheaton, 258; *Jones* v. *Davidson*, 2 Sneed, 447. If these notes were promises to pay *for the war bonds*, whether the consideration appeared on their face or not, they could not be enforced. But such is not their character, and their holders, by demanding their redemption, are not seeking to enforce any part of the contract between the bank and the military board. The contract they rely upon rests on the bank charter, and is not affected by the illegal character of any contract, in the execution of which the bills may have been used.

It is argued that the Bank of Tennessee was

merely a state agency, controlled by the State, and that its existence separate from the State was only formal. The effect then, if this be so, of holding the new issue valid, would be to make the true State Government at least indirectly, as sole stockholder in the bank, responsible for the acts of the usurped government. If the officers of the bank who put these bills into circulation had been appointed by the rebel State Government, and had derived their power from an illegitimate source, then it might be that the State could in no way be affected by their acts. But such was not the case. We have already seen that they were regularly appointed in peaceful times, and had the legal custody of the property and franchises of the bank. When the Government of Tennessee was overthrown the bank corporation remained intact.

In the *Bank of Tennessee* v. *Dibrell*, 3 Sneed, 379, this same position was taken, but Judge Caruthers in delivering the opinion of the court, pronounced it "unsound and fallacious."

In that case it was further said: "The fact that the bank is the creature and property of the State does not make it identical with, or even an integral part ,of the state sovereignty. It is a distinct fiscal corporation, enjoying a separate existence with its own chartered rights, obligations and powers." The corporation known as the Bank of Tennessee existing at and after the 6th of May, 1861, was the creature of the legitimate State Government, and if the interests of that government should suffer by the injudicious management on the part of the bank officers of the

funds of the corporation, by converting them into worthless stocks, the loss should not be shifted to innocent parties. It is a maxim, that where one of two innocent persons must suffer, he shall suffer, who, by his acts, occasioned the confidence or loss. 1st Sto. Eq. Ju., sec. 387; Sto. on Bills, sec. 411.

It may have been that the president and directors of the bank were strongly in sympathy with the rebellion, but it nowhere appears that they acted otherwise than freely and voluntarily in the purchase of the war bonds. On the contrary Mr. Torbett proves the purchase of the bonds was regarded as a good investment, and they were, for that reason, bought. The result of the war made the contract illegal from the beginning, and proved ruinous to the assets of the bank, but to my mind it by no means follows that the bank bills used in executing and extinguishing that contract are themselves void, or could be so declared either by the political or judicial departments of the government without violating the Constitution of the United States.

In conclusion I repeat what was stated in the beginning, that what is here said applies only to the bills in the hands of Duncan and Atchison, without intimating any opinion as to questions that may arise in regard to bills not yet put in suit. On the other questions in the case I concur in the opinion prepared by the Chief Justice.